**MULTI–CHANNEL TV CABLE COMPANY, d/b/a Adelphia Cable Communications, Plaintiff–Appellee,**

v.

**CHARLOTTESVILLE QUALITY CABLE OPERATING COMPANY, a Virginia Corporation; Rivanna Partnership, a Virginia general partnership; Alcova Realty & Management Company, Defendants–Appellants,**

and

**Fountain Court Limited Partnership, a Virginia limited partnership; John A. Schwab, Jr.; Bernard A. Schwab; C. Stuart Raynor, Jr., Intervenors.**

No. 94–1082.

United States Court of Appeals, Fourth Circuit.

Argued March 9, 1994.

Decided April 14, 1994.

**ARGUED:** Deborah Colleen Costlow, Winston & Strawn, Washington, DC, for appellants. John Douglas McKay, Barrick & McKay, Charlottesville, VA, for appellee. **ON BRIEF:** Thomas C. Power, Winston & Strawn, Washington, DC, for appellants. Franklyn F. Bergland, David C. Wagoner, Barrick & McKay, Charlottesville, VA; Philip J. Kantor, Bienstock & Clark, Miami, FL; Randall D. Fisher, John B. Glicksman, Adelphia Cable Communications, Coudersport, PA, for appellee.

Before WILKINSON, HAMILTON, and MICHAEL, Circuit Judges.

Affirmed as modified by published opinion. Judge HAMILTON wrote the opinion, in which Judge WILKINSON and Judge MICHAEL joined.

1. The Appellants include Charlottesville Quality Cable Operating Co. (CQC), Alcova Realty and Management Co. (Alcova), Rivanna Partnership (Rivanna Pa.), Fountain Court Limited Partnership (Fountain Court), John A. Schwab, Jr., Bernard A. Schwab, and C. Stuart Raynor.

## OPINION

HAMILTON, Circuit Judge:

This appeal challenges the propriety of a preliminary injunction which prohibits the Appellants—a cable television provider and four residential apartment complexes—from operating under cable provider agreements to the exclusion of a competing cable provider—Multi–Channel TV Cable Co., d/b/a Adelphia Cable Communications (Adelphia).[1] For the reasons stated herein, we affirm the preliminary injunction as modified.

### I

Adelphia and CQC are competing cable television providers in Charlottesville, Virginia. In 1981, Adelphia installed a cable distribution system in three multi-dwelling units (MDUs) in Charlottesville at the request of the MDU owners.[2] Adelphia installed these systems at its own expense. These distribution systems, known as "home run" systems, allowed Adelphia to provide cable television service to those individual tenants desiring such service. The home run system eliminated the previous "bulk service" in which the landlords subscribed to the cable television services in bulk, paid Adelphia one monthly fee, and provided cable television as part of its lease obligations to the tenants. After installation of the home run system, each tenant within the MDUs had the capacity to negotiate individual contracts with Adelphia for the provision of cable television, without any involvement by the MDU owners or the landlord. Adelphia maintained its home run systems at these MDUs at its own expense.

In 1990, Adelphia installed its home run system in another MDU in Charlottesville, Rivanna Terrace. Unlike the prior installations, the installation at Rivanna Terrace was a "pre-wire" project, meaning that Adelphia installed the system during construction of this MDU. Adelphia installed its system at the request of Beacon Construction Co., the

2. The MDUs were: Inglewood Square, Park Lane and Fountain Court.

general contractor in charge of building Rivanna Terrace, who served as agent for the MDU owner, Rivanna Pa., for purposes of procuring cable television equipment. Although a subcontractor actually installed the wiring within the walls, Adelphia provided the wiring free of charge. Following this installation, Rivanna Pa. allowed Adelphia to enter the complex and install its wall plates and other equipment necessary to complete the home run system and thereby provide cable service to tenants. Adelphia installed this equipment and subsequently maintained the entire cable system at its own expense. In the summer of 1993, Adelphia began offering cable service to the tenants within the four MDUs on an *a la carte* basis. The *a la carte* service allowed each tenant to customize the package of cable program services that he or she received.

In November 1993, the property manager for these four MDUs, Alcova, executed an exclusive cable television provider agreement with CQC. This agreement gave CQC the exclusive right to provide cable television services to the tenants within the four MDUs. The agreement allowed CQC to install its cable distribution equipment at the MDUs and provided that "[t]itle to and in the Equipment shall, at all times, remain with [CQC] ..., and no portion of the Equipment will be deemed a fixture of the Properties notwithstanding any affixation to the Properties." (J.A. 408). The agreement also provided that CQC would pay Alcova a "consultant fee" in exchange for "advice in connection with establishing and maintaining optimal service at your units." (J.A. 406). The "consultant fee" equalled twelve percent of CQC's cable service revenues from the tenants within each MDU. Alcova signed the written agreement as "agent" for the MDU owners, and the writing identified the rights and obligations of the MDU owners, rather than Alcova.

After executing this agreement, CQC began installing its cable distribution system at the four MDUs. CQC's cable distribution

system uses a microwave transmitter to transmit its signal from a central transmitting location to its subscribers, who receive the signal via special microwave antennas. Providing service to the MDUs under CQC's system requires both a central reception antenna at each MDU, as well as a cable distribution system, such as that installed by Adelphia, to carry the signal from the central reception point to each subscriber's television. Thus, to install the distribution system, CQC erected its microwave antennas at each MDU and connected the antenna to Adelphia's existing distribution system leading to the individual apartments.[3]

CQC's actions abruptly terminated Adelphia's service to its subscribers within the MDUs without the prior consent of either the tenants or Adelphia. Thereafter, Adelphia filed suit in the United States District Court for the Western District of Virginia. The complaint named CQC, Alcova, and Rivanna Pa. as defendants and alleged various claims, including: interference with an easement or irrevocable license; conversion of Adelphia's cable distribution system; tortious interference with Adelphia's contractual relationships; common law and statutory conspiracy; and a violation of the Virginia Residential Landlord and Tenant Act, Va.Code Ann. § 55–248.2, *et seq.* The complaint did not name the other three MDUs or their owners.

On December 3, 1993, Adelphia filed a motion requesting a preliminary injunction to prohibit the named defendants from operating under the exclusive provider agreement and to allow Adelphia to continue providing cable service to the MDU tenants pending the litigation. On December 7, 1993, Adelphia served an amended notice of hearing on its motion for preliminary injunction. In this notice, Adelphia indicated that it intended to move for a preliminary injunction against Rivanna Terrace, as well as the other three MDUs under the common management of Alcova.

---

**3.** When Adelphia's employees conducted a routine inspection of its distribution system at the MDUs, they discovered that the padlocks on its distribution boxes had been cut and the front panels of some of the boxes were missing. Inside the boxes, Adelphia's cables had been cut at the connectors. The cables from the distribution boxes leading into the individual apartments had been removed and inserted into CQC's boxes, which had been placed beside Adelphia's boxes.

On December 15, 1993, a magistrate judge conducted a hearing on Adelphia's motion for preliminary relief with the consent of the parties. 28 U.S.C. § 636(c). John A Schwab, Jr., the president and part owner of Alcova and a general partner in the four partnerships owning the four MDUs, attended the hearing and testified on behalf of the Appellants. At the conclusion of this hearing, the magistrate judge concluded that preliminary relief was appropriate. In reaching this conclusion, the magistrate judge found that, under the facts as currently developed, Adelphia established a strong likelihood of succeeding on the merits of some of its claims, reasoning that: (1) the "consultant fee" under the exclusive provider agreement amounted to an illegal kickback in violation of the Virginia Landlord Tenant Act; (2) the exclusive provider agreement and the subsequent interruption of Adelphia's service to the tenants of the MDUs amounted to tortious interference with Adelphia's contractual relations; (3) CQC's use of Adelphia's distribution system within the MDUs constituted conversion of Adelphia's equipment; and (4) the Appellants' actions supported a claim for both statutory and common law conspiracy. With respect to the tortious interference claim, the magistrate judge opined that, by allowing Adelphia to negotiate cable service contracts directly with the individual tenants of the MDUs, the MDU owners "gave [Adelphia] a business expectancy with those tenants" for the duration of the tenants' leases at the respective MDUs. (J.A. 335).

The magistrate judge also found that, without a preliminary injunction, Adelphia would suffer irreparable harm. The magistrate judge reasoned that, without the preliminary injunction, "the damages suffered by [Adelphia] are incapable of calculation, not simply difficult to calculate, because the service to customers varied." (J.A. 380). In other words, because Adelphia allowed each tenant to fashion the type of cable service desired, i.e., a la carte service, the magistrate judge found that Adelphia's damages would be incalculable because "there is no way of determining what menu services will satisfy the appetite of any particular subscriber whose appetite even may change during the subscription period." *Id.* The magistrate judge also found that Adelphia would suffer a loss of goodwill from its customers absent the preliminary injunction.

The magistrate judge then concluded that the potential irreparable harm to Adelphia outweighed the harm to the Appellants resulting from the preliminary relief. The magistrate judge reasoned that, by only preventing the Appellants from operating under the exclusive provider agreements, the preliminary injunction allowed CQC and Adelphia to compete for tenants within the MDUs on equal terms. Finally, the magistrate judge found that the public interest favored granting a preliminary injunction since the injunction would "stabilize" the delivery of cable services. (J.A. 382).

On December 16, 1993, the magistrate judge entered a preliminary injunction conditioned on Adelphia's payment of a $20,000 bond. The preliminary injunction prohibited the Appellants from operating under the exclusive provider agreements and prohibited the MDU owners or Alcova from expressing any preference for cable providers to the MDU tenants. The preliminary injunction also allowed Adelphia to reconnect its cable service to those tenants whose leases had not expired by December 13, 1993 and who desired reconnection. Finally, the preliminary injunction provided that, if some tenants wished to receive cable services from CQC, CQC could not utilize "any equipment, wiring or hardware belonging to or claimed to be the property of [Adelphia]." (J.A. 385).

The Appellants filed a timely notice of appeal.

## II

The Appellants first raise several prefatory challenges, only one of which warrants discussion. Specifically, the Appellants claim the preliminary injunction is invalid because it applies to MDU owners not named in Adelphia's complaint.[4] Because the com-

---

4. The preliminary injunction enjoined the exclusive provider agreements at Inglewood Square, Parklane, and Fountain Court, in addition to Rivanna Terrace. Adelphia's complaint did not name the first three MDUs or their owners.

plaint only named Rivanna Terrace, its owners and Alcova, but not the other three MDUs or their owners, the Appellants conclude that the preliminary injunction must be vacated as to the other three MDU owners. We disagree.

Fed.R.Civ.P. 65(d) provides that an injunction shall be binding upon "the parties to the action, their officers, agents ... and upon those persons in active concert or participation with them who receive actual notice of the order...." In the present case, the record contains sufficient evidence to suggest that the other three MDU owners acted in "active concert or participation with" Alcova and Rivanna Pa. For example, Alcova managed all four MDUs affected by the preliminary injunction and the exclusive provider agreement applied to all four MDUs. Moreover, the record indicates that the president and part owner of Alcova, John A. Schwab, Jr., is also a general partner in the four partnerships which own the four MDUs. (J.A. 177–78). Such evidence suggests that all four MDU owners and Alcova acted in "active concert" in arranging the exclusive provider agreements with CQC. This, coupled with the fact that John A. Schwab had notice of, and attended the preliminary injunction hearing, compels us to conclude that, under Rule 65(d), the preliminary injunction properly applies to all four MDUs and their owners.

## III

■ The Appellants next launch a frontal assault on the award of preliminary relief. Specifically, the Appellants claim that the magistrate judge erred in finding that: (1) Adelphia would suffer irreparable harm absent a preliminary injunction; (2) Adelphia's irreparable harm absent the preliminary injunction outweighed the harm to the Appellants if the injunction were granted; (3) Adelphia had a strong likelihood of success on the merits; and (4) the public interest favored granting the preliminary injunction. Because of these erroneous findings, the Appellants conclude that the preliminary injunction cannot withstand scrutiny. We disagree and discuss our reasons with respect to each argument separately.

## A

■ The requirements for granting preliminary relief are well known. In *Direx Isreal, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir.1991), we outlined the precise analytical framework which courts must employ in determining whether to grant preliminary relief. First, the party requesting preliminary relief must make a "clear showing" that he will suffer irreparable harm if the court denies his request. *Id.* at 812–13. Second, if the party establishes irreparable harm, "the *next* step then for the court to take is to balance the likelihood of irreparable harm to the plaintiff from the failure to grant interim relief against the likelihood of harm to the defendant from the grant of such relief." *Direx Israel,* 952 F.2d at 812. Third, if the balance tips decidedly in favor of the party requesting preliminary relief, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." *Id.* at 813. However, "if the balance does not tip decidedly there must be a strong probability of success on the merits." *Id.* Fourth, the court must evaluate whether the public interest favors granting preliminary relief. We review the award of preliminary relief for an abuse of discretion. *Id.* at 811.

## B

Appellants first claim the magistrate judge erroneously found that Adelphia would suffer irreparable harm absent the preliminary injunction. The Appellants reason that, because Adelphia's average revenue from the four MDUs in question provides an adequate basis for determining any lost revenue from the exclusive provider agreements, Adelphia would not suffer *irreparable* harm without the preliminary injunction. We disagree.

■ Generally, "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Danielson v. Local 275,* 479 F.2d 1033, 1037 (2d Cir.1973). Thus, when "the record indicates

that [plaintiff's loss] is a matter of simple mathematic calculation," a plaintiff fails to establish irreparable injury for preliminary injunction purposes. *Graham v. Triangle Pub.*, 344 F.2d 775, 776 (3d Cir.1965). However, when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied. *Merrill Lynch, Pierce, Fenner and Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir.1985). We review a finding of irreparable harm under the clearly erroneous standard. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 358 (4th Cir.1991).

In the present case, the magistrate judge found that Adelphia would suffer irreparable harm absent the preliminary injunction because its monetary damages could not be calculated due to the *a la carte* basis on which Adelphia offered cable services to each MDU tenant. The magistrate judge also found that, absent the preliminary injunction, Adelphia would be irreparably harmed by the loss of goodwill. Our review of the record reveals that these findings are not clearly erroneous.

Contrary to Appellants' assertion, the historical average of Adelphia's revenue does not provide an adequate basis for measuring the potential loss of revenue because Adelphia only began providing *a la carte* service in the summer of 1993. The relative novelty of such service clearly makes any calculation of Adelphia's damages "difficult to ascertain" and, therefore, supports a finding that Adelphia would suffer irreparable harm. *Danielson*, 479 F.2d at 1037. *See also Blackwelder Furn. Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 197 (4th Cir.1977) ("Irreparability of harm includes the impossibility of ascertaining *with any accuracy* the extent of the loss.") (emphasis added, citation omitted). Moreover, the threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm. *Id.* Thus, we conclude that the magistrate judge did not clearly err in finding that Adelphia would suffer irreparable harm absent the preliminary injunction.

C

Because Adelphia adequately established irreparable harm, "the *next* step then for the court to take is to balance the likelihood of irreparable harm to the plaintiff from the failure to grant interim relief against the likelihood of harm to the defendant from the grant of such relief." *Direx Israel*, 952 F.2d at 812. The Appellants identify three types of harm resulting from the preliminary relief, arguing that these harms outweigh the irreparable harm to Adelphia.

The Appellants first suggest that the part of the preliminary injunction prohibiting Alcova and the MDU owners from "communicating to its tenants any preferences of cable providers," operates as a prior restraint of speech in violation of the First Amendment. We agree. Injunctions against "pure expressions of opinion ... infringe upon the exercise of First Amendment rights." *Consolidation Coal Co. v. Disabled Miners*, 442 F.2d 1261, 1267 (4th Cir.), *cert. denied*, 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971). The challenged portion of the preliminary injunction in the present case improperly "restrains [Alcova and the MDU owners] from publicizing their grievances" as well as their opinions. *Id.*

Fortunately, this infirmity does not require dissolution of the entire injunction. Instead, we need only vacate that portion of the injunction which offends the First Amendment. *Id.* Accordingly, we hereby vacate that part of the injunction prohibiting the MDU owners and Alcova from expressing preferences for cable providers to the MDU tenants. By vacating this portion of the preliminary injunction, we also eliminate the perceived harm identified by the Appellants.

The Appellants next suggest that the preliminary relief, prohibiting CQC from entering into exclusive provider agreements, deprives CQC of potential revenue. Because the magistrate judge found the potential loss of revenue would irreparably harm Adelphia, Appellants suggest that the potential harm to CQC at least equals Adelphia's. We disagree. The preliminary injunction allows CQC to arrange *nonexclusive* agreements with MDU owners. Thus, the preliminary

injunction allows CQC and Adelphia to compete in an open market on equal terms. Accordingly, the perceived harm to CQC does not exist.

Finally, the Appellants suggest that, by allowing Adelphia continued access to the wiring within the relevant properties, the preliminary injunction deprives the property owners of their inherent right to exclude others from their property. We believe this perceived harm does not invalidate the magistrate judge's conclusion that the potential irreparable harm to Adelphia outweighs the perceived harm to Appellants. Although the injunction may impose a minimal inconvenience on Appellants in the use of a property right, at best this amounts to only a minor intrusion, insignificant in comparison to the potentially irreparable harm to Adelphia.

### D

Because the balance of harms tips decidedly in favor of Adelphia, preliminary relief is appropriate if Adelphia "has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." *Direx Israel*, 952 F.2d at 813. We conclude that Adelphia satisfied this requirement with respect to its claim for conversion.[5]

The Appellants contend that they did not convert Adelphia's cable distribution equipment within the MDUs, reasoning that the equipment became a fixture within each MDU and, therefore, belonged to the MDU owners. Because Adelphia had no legal title to this equipment, the Appellants conclude that the conversion claim fails as a matter of law. We disagree.

■ Under Virginia law, determining whether a particular chattel becomes a fixture or remains personalty involves the weighing of three factors. These factors are:

(1) the degree of permanency with which the chattels are annexed to the realty; (2) the adaptation of the chattels to the use or purpose to which the realty is devoted; and (3) the intention of the owner of the chattels to make them a permanent accession to the [property].

*Lamar Corp. v. City of Richmond*, 241 Va. 346, 402 S.E.2d 31, 34 (1991) (citing *Danville Holding Corp. v. Clement*, 178 Va. 223, 16 S.E.2d 345, 349 (1941)). Of these factors, "the intention of the party making the annexation is the paramount and controlling consideration." *Danville*, 16 S.E.2d at 349. Moreover, "the method or extent of the annexation carries little weight, except insofar as they relate to the nature of the article, the use to which it is applied and other attending circumstances as indicated in the intention of the party making the annexation." *Id.*

In the present case, the parties dispute whether the cable wiring may be extracted without inflicting substantial damage upon the property. However, because this factor only serves to identify the intent of Adelphia and otherwise "carries little weight," *id.*, we need not resolve this factual dispute. The other two tests clearly suggest that Adelphia intended to retain ownership of the equipment.

■ Under the second factor, a court must determine whether "the chattel is essential to the purpose for which the building is used or occupied...." *Danville*, 16 S.E.2d at 349. In the present case, the cable

**5.** We also believe that Adelphia was likely to succeed on its claim that the exclusive provider agreement violated the Virginia Landlord–Tenant Act. This Act proscribes payments by cable providers to landlords "in exchange for giving tenants ... access to [cable] service." Va.Code § 55–248.13:2. The exclusive provider agreement, under which CQC paid the property manager of the MDUs a "consultant fee," violates this Act because the payments were *tantamount* to payments to the MDU owners in exchange for giving CQC access to the MDUs. As previously discussed, John Schwab, Jr., the president and part owner of the property manager for the MDUs (Alcova), was also a general partner in the partnerships which owned all four MDUs. Moreover, the agreement continuously refers to the "owner" of the properties, and describes Alcova as an "agent" for the owners. Also, the "consultant fee" was based on the revenues from tenant cable subscriptions within the MDUs, thereby effectively compensating the MDU owners for allowing cable access to their buildings.

Because we conclude that Adelphia is likely to succeed on at least two of its claims, we need not address the remaining two claims considered by the magistrate judge: conspiracy and tortious interference with business relations.

distribution systems were not "placed in the building ... to carry out the very purpose for which the building[s][were] acquired, adopted, occupied and used." *Id.* In other words, the cable distribution systems, while beneficial to the MDUs, were not essential for the MDUs' primary purpose, housing tenants. Because the cable distribution systems are not necessary to effectuate the MDUs' primary purpose, the adaptation factor suggests that this chattel remained personalty, *i.e.*, belonging to Adelphia.

The third factor also favors Adelphia. Specifically, the facts suggest that Adelphia, the original owner of the chattels, intended to retain ownership of that property. For example, Adelphia either installed or provided the interior wiring for the distribution system at its own expense, as well as the wall plates and other equipment necessary to bring the system "on line." Also, since the time of installation, Adelphia has continuously maintained the equipment at its own expense. These factors clearly support the finding that Adelphia intended to retain possession.[6]

Thus, we conclude that the record, in its current state, suggests that the equipment comprising the cable distribution system does not qualify as a fixture and, therefore, does not belong to the MDU owners. Thus, by allowing Adelphia's competitor, CQC, to use this equipment, the MDU owners seemingly converted Adelphia's property. Accordingly, under the facts as currently developed, Adelphia established a strong likelihood of succeeding on its conversion claim.[7]

### E

Finally, the Appellants challenge the magistrate judge's finding that the public interest favored granting the preliminary injunction. The magistrate judge found that the public interest favored granting a preliminary injunction because the injunction would "stabilize" the delivery of cable services. Our review of the record suggests that this finding was not clearly erroneous.

### IV

For the reasons stated herein, we affirm the preliminary injunction as modified. The modification reflects our decision to vacate that part of the preliminary injunction prohibiting the MDU owners and Alcova from communicating to the MDU tenants any preference for cable providers.

*AFFIRMED AS MODIFIED.*

---

**6.** Though not dispositive, we also find persuasive support for this conclusion from the exclusive provider agreement between CQC and Alcova. That agreement specifically noted that none of CQC's equipment could be considered a fixture and CQC retained title to all such equipment installed at the MDUs.

**7.** Because we base our conclusions on a record which may be further developed in a trial on the merits, "[w]e are quick to note that the status imposed by the preliminary injunction is not permanent and does not determine the outcome on the merits. Those issues await trial and findings by the district court." *Faulkner v. Jones*, 10 F.3d 226, 234 (4th Cir.1993).