**COMCAST SCH HOLDINGS, INC., Plaintiff,**

v.

**The VILLAGES OF LAKE–SUMTER, INC., Defendant.**

**No. 5:01–Cv–147–Oc–10GRJ.**

United States District Court,
M.D. Florida,
Ocala Division.

Aug. 17, 2001.

Terry S. Bienstock, Jeffrey A. Jacobs, Philip Jay Kantor, Bienstock & Clark, Miami, FL, for plaintiff.

Stephen Warfield Johnson, McLin, Burnsed, Morrison, Johnson, Newman & Roy, P.A., Leesburg, FL, for defendant.

## PRELIMINARY INJUNCTION

HODGES, Senior Judge.

The Court, having considered Plaintiff's Motion For Preliminary Injunction, and

this Court being fully advised in the premises and for the reasons set forth in the Court's Report And Recommendation, finds that Plaintiff has demonstrated the necessary prerequisites for preliminary injunctive relief. Accordingly, it is ordered that:

1. During the pendency of this action The Villages Of Lake–Sumter, Inc. ("The Villages") is enjoined from:

(A) Denying Comcast Sch Holdings, Inc. ("Comcast") access to The Villages PUD in Marion County for the purpose of constructing a cable system utilizing public rights-of-way and easements dedicated for compatible uses, including the joint trench as it is opened for any other utilities, and areas where the joint trench has already been closed;

(B) Interfering with Comcast's construction of a cable television system in The Villages PUD utilizing the public rights-of-way and easements dedicated for compatible uses, including all utility easements;

2. This Order is binding upon The Villages, its officers, agents, servants, employees and attorneys, and upon those persons in active concert or participation with The Villages who receive actual notice of this Order by personal service or otherwise.

3. This Order will become effective by the posting of a bond by Comcast in the form approved by the Clerk of the Court in the amount of $25,000.

**IT IS SO ORDERED.**

1. Because the Defendant filed objections (Docs. 30 and 31) to the Report and Recommendation of the United States Magistrate Judge, I have reviewed the matter *de novo* as required by 28 USC § 636(b)(1). Still, the

*ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION*

This is an action for declaratory and injunctive relief brought by the Plaintiff, Comcast, a cable television company, against the Defendant, Villages, a real estate development company, under the Cable Communications Policy Act of 1984, 47 USC § 521 *et seq.* The complaint (Doc. 1) also asserts a pendent claim for specific performance of a contract based on state law. The Court has federal question jurisdiction of the action pursuant to 28 USC § 1331.

Shortly after the filing of the complaint, Comcast filed a separate motion for a preliminary injunction (Doc. 5). I referred the motion to the United States Magistrate Judge (Doc. 7) to conduct such proceedings as he deemed necessary to the making of a report and recommendation concerning the grant or denial of preliminary injunctive relief. The United States Magistrate Judge, with his customary promptness and thoroughness, then conducted an early hearing (Doc. 23) after compiling a complete record for purposes of the motion under M.D.Fla.Rules 4.05 and 4.06. The resulting Report and Recommendation of the United States Magistrate Judge (Doc. 29) recommends that the Plaintiff's motion should be granted and that a preliminary injunction should be issued.

After careful consideration, however, I have determined that the motion should be denied and that a preliminary injunction should not be issued.[1]

*Discussion*

■ Comcast is a cable television company providing cable service to residents

court is indebted to the Magistrate Judge for his cogent presentation and discussion of the core issues of law informing the decision to be made.

of Marion, Lake and Sumter Counties. It has franchises issued to it by Lake and Sumter Counties, but operates without a franchise in Marion County because Marion does not presently have an ordinance requiring one.[2]

Villages is the developer of a large residential housing property located in the intersecting corners of Marion, Lake and Sumter Counties. It is presently expanding the project into Marion County where it is planning to build approximately 5,000 new homes. Villages has submitted to the appropriate authorities in Marion County various preliminary plats and engineering plans depicting, among other things, the location of utility easements. Marion County has approved those plats and plans; however, Villages has not yet "dedicated" the plats by recording them in the manner prescribed by Florida Statute 177.081(2) and (3) (2000):

177.081 Dedication and approval.—

\* \* \* \* \* \*

(2) Every plat of a subdivision filed for record must contain a dedication by the owner or owners of record. The dedication must be executed by all persons, corporations, or entities whose signature would be required to convey record fee simple title to the lands being dedicated in the same manner in which deeds are required to be executed. All mortgagees having a record interest in the lands subdivided shall execute, in the same manner in which deeds are required to be executed, either the dedication contained on the plat or a separate instrument joining in and ratifying the plat and all dedications and reservations thereon.

(3) When a tract or parcel of land has been subdivided and a plat thereof bearing the dedication executed by the owners of record and mortgagees having a record interest in the lands subdivided, and when the approval of the governing body has been secured and recorded in compliance with this part, all streets, alleys, easements, rights-of-way, and public areas shown on such plat, unless otherwise stated, shall be deemed to have been dedicated to the public for the uses and purposes thereon stated.

Even though the "dedication" of the pertinent plats has not been formalized under the statute, Villages is nonetheless permitting telephone and electric utility companies, and one cable television competitor of Comcast, to dig trenches and lay cable in the development project in the areas depicted as easements on the preliminary plats. Comcast, however, has been denied the same opportunity, and it seeks injunctive relief to prohibit this exclusion by Villages.[3] Its claim to such relief is based upon a provision of the Cable Act, 47 USC § 541(a)(1) and (2):

§ 541. General franchise requirements

(a) Authority to award franchises; public rights-of-way and easements; equal access to service; time for provision of service; assurances

(1) A franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction; except that a franchising authority may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise.

\* \* \* \* \* \*

(2) Any franchise shall be construed to authorize the construction of a cable

---

2. The complaint alleges that Comcast holds a "constructive franchise" meeting the requirements of the Cable Act, 47 USC § 541 (Doc. 1, paragraph 47, page 11).

3. These circumstances, and the prior contractual relationship between the parties, are described in more detail in the Report and Recommendation of the Magistrate Judge.

system over public rights-of-way, and through easements, which is within the area to be serviced by the cable system and which have been *dedicated* for compatible uses, ... (Emphasis supplied)

The crux of the present dispute centers on the word "dedicated" as used in the Cable Act; and, more particularly, whether a property owner's grant of private easements not yet formally dedicated to the public under governing state law may nevertheless be viewed as dedicated in fact sufficient to trigger application of § 541(a)(2).

That question appears to have been negatively answered in this Circuit by *Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI, Ltd.,* 953 F.2d 600 (11th Cir.1992), *cert. denied,* 506 U.S. 862, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992), *rehr'g. en banc denied,* 988 F.2d 1071 (1993), Chief Judge Tjoflat and Judges Hatchett, Anderson and Kravitch dissenting.

Today we have endeavored to clarify both Section 621(a)(2) of the Cable Act [47 USC § 541(a)(2)] and our prior decisions defining the right of access granted by this provision. In order to avoid substantial constitutional problems and in order to be consistent with our prior decisions in this area of the law, we have concluded that Section 621(a)(2) [47 USC § 541(a)(2)] provides a franchised cable company with the right to access only those easements which have been dedicated for general utility use, whether by plat recordation for a residential subdivision or otherwise. The alleged easements existing on McNeil's property have not been dedicated by McNeil for general utility use. Rather, these easements were privately granted by McNeil in order to allow limited rights of access to particular entities. Therefore, under Section 621(a)(2) of the Cable Act,

Smyrna Cable has no right to forcibly access and occupy those easements. *Id.*, 953 F.2d at 610.

In two earlier decisions of the court under the Cable Act, *Centel Cable Television Company of Florida v. Admiral's Cove Associates, Ltd.,* 835 F.2d 1359 (11th Cir.1988), and *Centel Cable Television Company of Florida v. Thos. J. White Development Corporation,* 902 F.2d 905 (11th Cir.1990), the court had first decided (in *Admiral's Cove*) that the Cable Act inferred and created a private right of action in cable franchisees to enforce their rights under the Act, and had then decided (in *Thos. J. White Development Corporation*) that a developer could not exclude a cable company from using private roads to gain access to dedicated utility easements because, under Florida law, such right of access was implied from the dedicated easement itself. *Id.*, 902 F.2d at 909, note 9.

There is room for reasonable disagreement as to whether the result reached in *Cable Holdings of Georgia, Inc.,* is fully harmonious with the two earlier decisions of the circuit as amply demonstrated by then Chief Judge Tjoflat's dissent from the court's denial of rehearing *en banc.* See *Cable Holdings of Georgia, Inc.,* 988 F.2d 1071 (11th Cir.1993) (Tjoflat, Chief Judge, dissenting.) And, in his Report and Recommendation, the United States Magistrate Judge declined to follow *Cable Holdings of Georgia* because that decision "would appear to be directly at odds with the holdings in *Admiral's Cove* and *Thos. J. White.*" (Doc. 29, Report and Recommendation, at 11).

 In making that decision the Magistrate Judge purported to follow and apply the circuit's prior precedent rule—that in the event of conflicting decisions, the precedent established by the first panel decision binds all subsequent panels until the

conflict is resolved *en banc*. See *United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir.1998), *en banc*, and cases there cited.

The prior precedent rule of the Circuit, however, is a rule imposed by the court of appeals upon itself. It does not convey a license to the district courts to decide whether panel decisions of the circuit are in conflict and, if so, to disregard the most recent decision of the court on the subject at hand. And that is especially true in this instance where the most recent decision of the circuit expressly considered the conflict issue and expressly held that there is no conflict. So far as this court is concerned, therefore, *Cable Holdings of Georgia* cannot be read as being in conflict with the two earlier decisions because *Cable Holdings* itself held otherwise, and this court is bound by that decision. Furthermore, the full court declined to rehear *Cable Holdings en banc*, despite the published dissent of Chief Judge Tjoflat, and while that denial of *en banc* reconsideration may not be the functional legal equivalent of an *en banc* endorsement of the panel opinion, it clearly leaves *Cable Holdings'* distinguishment of the earlier decisions undisturbed as the present law of the circuit. It is also of some note in that regard that *Cable Holdings* has been followed by both the Fourth and the Eighth Circuits. See *Media General Cable of Fairfax, Inc. v. Sequoyah Condominium Council of Co-Owners*, 991 F.2d 1169 (4th Cir.1993), and *TCI of North Dakota, Inc. v. Schriock Holding Company*, 11 F.3d 812 (8th Cir.1993).

The Magistrate Judge in his Report and Recommendation also lays out reasons why *Cable Holdings* could be limited in its application in a way that would exclude the decision as controlling authority in this case, and that this would make practical sense because otherwise "developers would be given carte blanche to start their own cable companies, install the cable lines . . . and then record the plat . . . without having to provide access to competing cable companies." (Doc. 29, Report and Recommendation, at 13). Failing to circumscribe *Cable Holdings* may well produce just that result, but the decision in the case suggests that the court was well aware of that effect of its decision and believed that the statute must be so construed in order to avoid constitutional infirmity under the Takings Clause of the Fifth Amendment.

■ I therefore conclude, unlike the Magistrate Judge, that the Plaintiff has not demonstrated a substantial likelihood of success on the merits of its claim under the Cable Act. I agree with the Magistrate Judge, however, in his conclusion that the Plaintiff has failed to establish, at this time, a substantial likelihood of success on the merits of its claim for breach of contract.

It follows that the motion for a preliminary injunction (Doc. 5) is DENIED.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION[1]

Pending before the Court on an Order of Reference (Doc. 7) are Plaintiff's Motion For Preliminary Injunction (Doc. 5), Plaintiff's Memorandum Of Law In Support Of Its Motion For Preliminary Injunction (Doc. 6) and Defendant, The Villages Of Lake–Sumter, Inc.'s Memorandum In Opposition To Plaintiff's Motion For Preliminary Injunction. (Doc. 14.) As evidence in support of its request for a preliminary injunction Plaintiff, Comcast SCH Holdings. Inc. ("Comcast") has filed the affida-

---

1. Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D.Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

vits of Mark Windus (Doc. 10), Danny Ferguson (Doc. 11), and Steve Dvoskin. (Doc. 12.) Defendant The Villages Of Lake Sumter, Inc. ("The Villages") has filed the affidavits of Martin L. Dzuro (Doc. 20), Gary Morse (Doc. 19), Peter F. Wahl (Doc. 18), Phil Markward (Doc. 17) and John Parker. (Doc. 16.) A hearing limited to argument of counsel was held on June 19, 2001 and, accordingly, the matter is now ripe for resolution. For the reasons discussed below, Comcast's Motion For Preliminary Injunction is due to be **GRANTED**.

## I. BACKGROUND

Comcast[2] is a cable television company providing cable service to residents of Marion, Sumter and Lake Counties. Comcast has cable franchises granted by Lake and Sumter counties. Because Marion County presently does not have an ordinance requiring a cable operator to obtain a formal franchise, Comcast operates in Marion County without a franchise.[3]

Defendant, The Villages, is the developer of "The Villages," a large residential, Planned Unit Development ("PUD"), located in the intersecting corners of Marion, Sumter and Lake counties. Presently, The Villages is expanding into Marion County, where the developer is planning to build approximately 5,000 new homes. The principals of The Villages have an ownership interest[4] in a newly formed cable television company called Clearlink, which at present competes with Comcast for customers in the portion of The Villages located in Marion County.

The relationship between the parties dates back to 1991 when Comcast's predecessor entered into an Agreement for the Purchase of Assets ("Purchase Agreement") with Senior Cablevision.[5] Pursuant to the Purchase Agreement Senior Cablevision (which was owned by the same principals who owned The Villages) was required to design and build a complete cable plant to provide cable service to the residences in an area of The Villages designated as the "Development Area." When any portion of the cable plant was completed The Villages was required to turn over the facilities to Comcast and Comcast was required to pay a fixed price per home based upon the services ordered by the customer. Since 1991 Comcast and The Villages have operated under the Purchase Agreement in Sumter and Lake counties.

The Purchase Agreement also provides that its terms extend to "contiguous areas", although the term "contiguous" is not defined in the Purchase Agreement. In the Marion County portion of The Villages, which is presently being developed, cable facilities are being installed by Clearlink. Comcast contends that despite repeated demands The Villages has failed to install and turn over to Comcast any cable facilities in the Marion County portion of The Villages.

Further, Comcast has requested access to the open trenches being used by Clearlink and other utilities in order to install its own cable lines. The Villages has required Comcast to enter into a joint trench agreement and pay a trenching fee that

2. Comcast is the successor to Scripps–Howard Broadcasting Company as the owner of the cable system. Scripps–Howard purchased the cable system from Senior Cablevision, which was owned by the same persons who own The Villages. (Doc. 10, ¶ 8.)

3. Notwithstanding that there is no requirement to obtain a formal franchise in Marion County, Marion County has issued permits to Comcast approving of its construction activities.

4. Doc. 10, ¶ 15.

5. (Doc. 1, Ex. A.)

exceeds what it would cost Comcast to trench by itself. Alternatively, Comcast has been told that it could wait for a permit from the local Community Development District ("CDD") after the final plats are recorded.[6] The Villages conceded at the hearing that it does not charge a trenching fee to Clearlink for installation of its cable lines and Clearlink is installing its cable lines without the necessity of a permit from the CDD.

Installation of cable lines early on while other utilities—such as electric, telephone and gas—are installing their lines is critical because of the disruptive effect of installation after the other utilities have completed their work[7] and because of the resulting delays in having cable access available at the time the new homeowner takes occupancy. In addition, a homeowner is much less likely to switch cable companies after their initial selection because of the disruptive effect of having to dig up lawns, sidewalks and streets.

Comcast contends that these actions of The Villages violate both the terms of the Purchase Agreement and the provisions of the federal Cable Communications Policy Act of 1984 (the "Cable Act"). According to Comcast, if preliminary injunctive relief is not granted its ability to compete will be irreparably harmed because Clearlink's system already will be installed and active when new residents move in.

The Villages denies that it is violating the Cable Act by failing to provide access to Comcast in the Marion County portion of the PUD arguing that until the plat has been recorded in the public records of

Marion County that portion of the property remains private. As to the Purchase Agreement, The Villages contends that the Marion County portion of the PUD now being developed is not "contiguous" and, therefore, it is not obligated to provide a cable system to Comcast. Moreover, The Villages contends that any rights Comcast may have under the Purchase Agreement relating to the Marion County portion of the PUD were relinquished by Comcast pursuant to a letter dated March 28, 2000, which the parties executed as part of a proposed purchase of Comcast by Time Warner.[8]

## II. DISCUSSION

The preliminary injunction is an "extraordinary and drastic remedy" that should only be granted where the movant carries the burden of persuasion as to the following four prerequisites: (1) substantial likelihood of success on the merits, (2) that there is a substantial threat plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may cause to the defendant, and (4) that granting the preliminary injunction will not disserve the public interest.[9] The Court finds that Comcast has carried the burden as to all four prerequisites.

### A. SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

#### 1. Violation of The Cable Act

Section 621(a)(2) of the Cable Act authorizes a cable company to use both "pub-

---

**6.** (Doc. 11, ¶ 19).

**7.** In addition to the increased cost of installing cable lines after other utilities are in place, trenches have been closed and curbs and sidewalks installed, each utility trench has a set depth and placement for each utility. It, therefore, becomes much more difficult to

install cable lines or any other utility lines after the trench has been closed.

**8.** The proposed sale to Time Warner was never completed and, therefore, according to Comcast the March 28 letter is not effective.

**9.** See, Warren Publ'g., Inc. v. Microdos Data Corp., 115 F.3d 1509, 1516 (11th Cir.1997).

lic rights-of-way" and "easements ... dedicated for compatible uses" to install its cable. 47 U.S.C. § 541(a)(2).[10] The Eleventh Circuit has held that a cable company has an implied right of action' under this section of the Cable Act to compel access to compatible easements.[11] There is little question that a cable operator has the right to "piggyback" on existing easements by laying their wires along the existing utility easements.[12] Thus, if the only issue in the case was whether Comcast has a right of access to lay its lines in the trenches with existing utilities The Villages would concede that it has no right to exclude Comcast. That is not, however, the case here.

In the instant case The Villages contends that there are no "dedicated" easements until the final plats are officially recorded in Marion County. From this premise Defendant concludes that because the final plats have not been recorded all of the land in the Marion County portion

of the PUD remains private land. As private land The Villages contends that it has the right to exclude Comcast and that its actions are consistent with *Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI, Ltd.,*[13] the Eleventh Circuit's most recent decision interpreting the reach of the Cable Act.

Although the final plat has not been recorded The Villages has, nonetheless, prepared and submitted to the appropriate governmental authorities of Marion County, Development Improvement Plans, which have been reviewed and approved by Marion County.[14] These Improvement Plans consist of, among other documents, preliminary plats and detailed Master Trenching Plans, which depict in detail the location of utility easements, public rights of way and all of the necessary information required to dig trenches and install all of the utilities in the PUD.[15] Typically, the easements granted to utilities in the Improvement Plans do not change because by the time the final plats are recorded all of the utilities have been installed.[16] The

---

**10.** This provision further provides that in using such easements the cable operator ensure—

> (A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;
> (B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both;
> (C) that the owner of the property be justly compensated by the cable operator for any damages by the installation, construction, operation, or removal of such facilities by the cable operator.

**11.** *Centel Cable Television Co. of Florida v. Admiral's Cove Assocs., Ltd.,* 835 F.2d 1359, 1364 (11th Cir.1988).

**12.** *Id.* at 1362.

**13.** 953 F.2d 600 (11th Cir.1992), *rehearing en banc denied,* 991 F.2d 1169 (1993).

**14.** (Doc. 11, ¶ 13, Ex. C.)

**15.** *Id.*

**16.** Although John Parker, Vice–President of Development for The Villages avers that "[I]mprovement Plans submitted pursuant to a platting process are preliminary in nature and are frequently subject to extensive changes" (Doc. 16, ¶ 14) he does not contend that the location of utility easements are substantially changed from the preliminary plat to the final plat. The fact that utility easements do not change from preliminary platting to the final plat is supported by the provisions of the Marion County, Land Development Code. The Land Development Code of Marion County expressly provides that: "The dimensions and alignment of improvements shown on the final plat shall conform to the approved preliminary plat except for minor variations due to final computations." *See,* Land Development Code, Marion County (Adopted June 11, 1992) Section 3, Preliminary And Final Plats, paragraph c.(1)(b) (page 8–11). The Land Development Code goes on to provide that: "All subdivision improve-

evidence also establishes that utility companies, such as Sumter Electric, Sprint, Teco Peoples Gas and Clearlink, a competing cable company, have already laid their utility lines underground in trenches using the future public rights of way and easements depicted on the Improvement Plans.[17] Despite the fact that approved Improvement Plans have been issued by Marion County and despite the fact that the other utilities—including a cable company—have installed, and are currently installing, their utility lines in the trenches, The Villages has advised Comcast that if it attempts to install lines before the final plat is recorded it will be treated as a trespasser.[18] These facts and events are largely undisputed by the parties, although each side attempts to place its own "spin" on these facts.

Accordingly, resolution of whether Comcast has a substantial likelihood of prevailing on its claims under the Cable Act is not dependent on resolution of conflicting facts but rather is almost entirely dependent upon an analysis of the Eleventh Circuit's interpretation of the reach of the Cable Act and the meaning of the term "dedicated."

The Eleventh Circuit has addressed the issue of access by a cable operator under the Cable Act on three occasions. The first instance was in *Admiral's Cove*[19], in which Judge Fay initially held that cable franchises have an implied right of action under § 621(a)(2) of the Cable Act. In *Admiral's Cove* the nature of the easements upon which the cable franchisee had alleged a right of access involved "recorded plats listing easements for telephone and electric utilities." These easements were not publicly dedicated general utility easements but rather were easements reserved for specific uses. In holding that the term "dedicated" in § 621(a)(2) was not limited to public easements, Judge Fay expressly rejected the developer's argument "that Congress only authorized cable franchises to place their cables in publicly owned easements."[20]

Subsequently, in *Centel Cable Television Company of Florida v. Thos. J. White Development Corp.*[21] the Eleventh Circuit was faced with the issue of whether the Cable Act required the developer to grant a cable franchisee access over the developer's private roads in order for the cable company to access the easements that had been given to specific utilities. The Eleventh Circuit rejected the developer's argument and held that § 621(a)(2) grants cable franchises the right to cross the developer's property to access easements dedicated to specific utilities.

Thus, both *Admiral's Cove* and *Thos. J. White* stand for the proposition that the Cable Act requires a developer to provide access to a cable company for both public and private easements. Because neither case limited the reach of the Cable Act to only public easements, these cases support Comcast's position that The Villages was required to grant access even though the private easements granted to the utilities to install their lines had not become public easements through recordation.

Subsequently, in *Cable Holdings of Georgia v. McNeil Real Estate Fund VI, Ltd.*[22] the Eleventh Circuit was presented with the issue of whether the right of access under the Cable Act extends to

---

ments shall be constructed in accordance with approved plans." (Section 4, paragraph a.(5), page 8–14).

**17.** (Doc. 11, ¶ 18).

**18.** (Doc. 10, Ex. A).

**19.** 835 F.2d 1359 (11th Cir.1988).

**20.** *Id.* at 1363.

**21.** 902 F.2d 905 (11th Cir.1990).

**22.** 953 F.2d 600 (11th Cir.1992).

existing utility easements in the interior of apartment buildings owned by the developer. Judge Birch held that the Cable Act does not provide a right to access wholly private easements granted by property owners in favor of particular utilities.[23] As additional support for this conclusion Judge Birch interpreted the term "dedicated" in the real property sense and according to the definition in Black's Law Dictionary. Thus, according to Judge Birch, "[a]n easement is legally 'dedicated' only when the private property owner entirely relinquishes his rights of exclusion regarding the easement so that the general public may use the property."[24] By limiting the reach of the Cable Act only to public easements the *Cables Holdings of Georgia* court would appear to be directly at odds with the holdings in *Admiral's Cove* and *Thos. J. White.*

Where there are conflicting decisions by different panels the black letter rule in the Eleventh Circuit is that the precedent set by the first panel binds all subsequent panels and that the prior panel decision can only be overruled by an en banc decision of the Court.[25] Pursuant to this mandate this Court is bound to follow the decision in *Admiral's Cove,* which was reaffirmed in *Thos. J. White.*

Notwithstanding the prior panel rule, even if it is assumed that *Cable Holdings of Georgia* does not directly conflict with *Admiral's Cove* and *Thos. J. White* —and thus it may stand on its own—the case can be limited on its facts to the issue of whether developers must provide access to cable companies in apartment complexes or multi-unit developments ("MUD"). Typically, with regard to MUD's there is no platting process involved as is the case

with PUD's. Thus, with PUD's in order to begin development of the property the developer must designate and then obtain approval from the appropriate local governmental authority of the areas where the utilities are to be constructed. As a result of this platting process, "once an easement is established [however obtained] it is well within the authority of Congress to include cable television as a user."[26] Because this platting process is not required for MUD's the developer never voluntarily relinquishes control over his private property and, consequently, it follows that the Cable Act would not require that access be given to a cable company.

Furthermore, the *Cable Holdings of Georgia* court in holding that the Cable Act did not require access to a MUD, found it significant that Congress originally included in the Cable Act a proposed section 633, which would have provided a franchised cable company with a right to access the interior of a MUD when service was requested by a tenant, even if the owner objected to the cable installation.[27] This provision was ultimately rejected by Congress. It is therefore reasonable to conclude that the Cable Act should not be extended to MUD's, an area specifically excluded by Congress.

Lastly, close inspection of the express holding in *Cable Holdings of Georgia* discloses that the Court did not intend to limit the reach of the Cable Act only to situations where the plats were recorded. The court held that "[w]e have concluded that Section 621(a)(2) provides a franchised cable company with the right to access only those easements which have been dedicated for general utility use,

---

23. *Id.* at 606.

24. *Id.*

25. *See, Bonner v. City of Prichard,* 661 F.2d 1206, 1209–1210 (11th Cir.1981) (en banc);

*United States v. Steele,* 147 F.3d 1316, 1317–18 (11th Cir.1998) (en banc).

26. *Admiral's Cove,* 835 F.2d at 1363 n. 7.

27. 953 F.2d at 606.

**1348**

whether by plat recordation for a residential subdivision *or otherwise.*"[28] Use of the word "otherwise" evidences that the court contemplated that the Cable Act also extends to situations where the easement has been granted other than through actual recordation.[29] Accordingly, the narrow holding of *Cable Holdings of Georgia* does not support Defendant's argument that it is not required to provide access to Comcast until final recordation takes place.

This interpretation also makes practical sense. If the act of recordation was viewed as the triggering event for application of the Cable Act, developers would be given carte blanche to start their own cable companies, install the cable lines, construct the improvements, build the homes and then record the plat on the eve of closing with a homeowner without having to provide access to competing cable companies. Under this scenario the developer's cable company would be sure to gar-

ner all of the homeowners as subscribers and the competing cable company would be forced out of business in that PUD. The key event that triggers the application of the Cable Act is when the developer grants easements or access to other utilities under a governmentally · approved plan. At that juncture the developer has taken affirmative steps to relinquish his private property rights through the granting of access to utilities and, thus, the government has an enhanced interest in insuring that cable companies have access to the property. This situation is markedly different from the situation where a private owner of a MUD is forced to grant access in his buildings to cable companies where the owner has not granted easements to utilities through a platting process.

Accordingly, for all of these reasons the Court concludes that pursuant to *Admiral's Cove* and *Thos. J. White*, Comcast has a substantial likelihood of success on the merits of its claim under the Cable Act.[30]

---

28. 953 F.2d at 609 (emphasis added).

29. Another reason the *Cable Holdings of Georgia* court included the word "otherwise" may have been in recognition of its Fifth Amendment analysis. While attempting to interpret the Cable Act to avoid the constitutional question, the court, nonetheless, explained that the key to avoiding the takings issue was to focus on the fact that "through dedication the property owner has *voluntarily relinquished* his right to exclude users." 953 F.2d at 609. (emphasis added). In a footnote, *see* 953 F.2d 610 n. 11, the court observed that the key to solving the Fifth Amendment 'takings question', and the reason the Fifth Amendment issue was avoided in both *Admiral's Cove* and *Thos. J. White*, is the fact that the property owner *voluntarily* relinquished his right of exclusion through the granting of easements. Once the owner relinquishes his exclusion rights, the government's regulatory abilities are greatly enhanced. Thus, as evidenced by *Admiral's Cove* and *Thos. J. White*, because rights can be relinquished by an owner other than through the act of recordation, the Cable Act must extend to easements granted other than through recordation. Inclusion of the

word "otherwise" in its holding implicitly recognized this fact.

30. The Villages also argues that Comcast cannot invoke the Cable Act because it does not have a formal franchise from Marion County. This argument is not supported by the provisions of the Cable Act for at least two reasons. As previously discussed, Comcast does not have a formal franchise from Marion County because Marion County is one of the few counties in Florida, or elsewhere, that does not have an ordinance requiring that a cable company obtain a franchise. However, under 47 U.S.C. § 541(b)(2) cable operators who were lawfully providing cable service without a franchise on July 1, 1984 are not required to obtain a formal franchise unless the local franchising authority so requires. Comcast, through its predecessor, has been operating in Marion County since 1981. Second, the definition of the term "franchise" in 47 U.S.C. § 522(9) includes "an initial authorization . . . issued by a franchising authority . . . whether designated as a franchise, permit . . . or otherwise, which authorizes the construction or operation of a cable system." Marion County has issued permits to Comcast to install facili-

### 2. *Rights Under The Purchase Agreement*

Alternatively, Comcast argues that it is entitled to the entry of a preliminary injunction because its rights under the Purchase Agreement have been violated. The parties do not dispute that the Purchase Agreement provides Comcast with certain rights at The Villages, and that if the Purchase Agreement applies to the Marion County portion of The Villages, Comcast would be entitled to relief.

Instead, the dispute focuses on two issues. First, whether the Marion County portion of the Purchase Agreement is considered to be a "contiguous" area under the Purchase Agreement in which case the Purchase Agreement would apply. Second, it is disputed whether the "letter agreement" dated March 28, 2000 [31] bars Comcast from claiming that the Purchase Agreement applies in Marion County.

The letter agreement was entered into as part of a proposed sale of Comcast's assets to Time Warner. The letter agreement expressly states in relevant part that "The Village Agreement (a) includes all of the property subject to the Tri-county Villages Development of Regional Impact, ... but (b) does not include any property within Marion County ..." [32] If this letter agreement is binding, as contended by The Villages, Comcast would not have any rights under the Purchase Agreement in Marion County. Comcast argues that the letter is merely an estoppel letter typically executed as part of a proposed sale and that it is not binding unless and until the sale occurred and, as such, is invalid for lack of consideration.

The Villages argues that there is nothing on the face of the letter agreement that indicates it is contingent on the completion of the Time Warner sale. Further, The Villages has submitted evidence of record averring that the letter agreement was executed, for among other reasons, to clarify the ambiguity in the Purchase Agreement regarding whether Marion County was included.[33] Relying upon the affidavit of Gary Morse, The Villages also takes the position that it has acted in reliance upon the letter agreement and that since the execution of the letter agreement Comcast has never asserted that Marion County is covered under the Purchase Agreement as evidenced by the fact that Comcast has not requested that The Villages convey any cable systems in the Villages of Marion but rather has chosen to construct its own cable system in Marion County.[34]

Although the letter agreement would appear on its face to be a typical estoppel letter, this determination cannot be made on this record. Factual issues have been sufficiently raised by The Villages concerning the enforceability and binding effect of the letter agreement. For this reason the Court, at this juncture, cannot conclude on this record that Comcast has a substantial likelihood of prevailing on the merits of its breach of contract claim. Obviously, if the letter agreement is determined to be binding and excludes Marion County the issue of whether that portion of The Villages in Marion County, which is the object of this lawsuit, is or is not "contiguous" would be moot. For this reason the Court need not resolve, at this time, whether the Marion County portion of The Villages is covered under the Purchase Agreement as "contiguous" property.

---

ties in Marion County and thus Comcast would qualify as a franchise under the Cable Act under either scenario.

**31.** Doc. 12, Ex A.

**32.** Id. at ¶ 5.

**33.** Doc. 19, ¶ 5.

**34.** *Id.* ¶ 10.

Accordingly, for these reasons the Court concludes that Comcast has failed to establish (on this record) that it has a substantial likelihood of success on the merits of its claim for breach of the Purchase Agreement. Nonetheless, because the Court has determined that Comcast has established its likelihood of success on its claim under the Cable Act the Court will address the remaining three prerequisites for preliminary injunction as they apply to the Cable Act.

## B. *Irreparable Injury*

The evidence of record establishes that if a preliminary injunction is not entered Comcast will suffer irreparable injury. Each day that Comcast is denied access to lay its cable lines results in further delay in having cable lines available when homeowners actually close on their property and subscribe for cable service.[35] Additionally, it is much more costly to install a cable system after other utility lines, streets, curbs, sidewalks, and landscaping are installed.[36] In addition, the disruptive effect of installation of cable lines and equipment *after* streets, sidewalks, curbs and landscaping have been installed impairs Comcast's ability to obtain new subscribers because of their tendency to stay with their existing company rather than having trenching done on their property for installation of the new cable lines.[37] Most importantly, were Comcast denied the right to construct a cable system dur-

ing the pendency of this case, Clearlink would enjoy a judicially sanctioned monopoly during the pendency of this case, and at least until the final plat is recorded.[38]

In situations, such as here, where a cable company is being denied access to construct its system the Eleventh Circuit, as well as courts elsewhere, have recognized that irreparable injury will result if relief is not granted.[39] Such "late-comer" injury is irreparable because it is difficult to establish, if at all, which customers would have subscribed to Comcast had Comcast been available to them at the time they moved into their new home. Moreover, the resulting damage to the goodwill and reputation of the late-comer is impossible to ascertain. Accordingly, because such damages cannot be quantified the Court concludes that Comcast has established that it would suffer irreparable injury unless a preliminary injunction is entered.

## C. *Threatened Injury To Plaintiff Outweighs Any Harm To Defendant*

There should be no damage to The Villages if the injunction is granted. Although there is always a possibility that damage to property could occur as a result of the installation of the cable lines, the Cable Act provides that the cable company must bear the cost of installation and that the cable operator is required to justly compensate the owner for any damages caused by the installation or construction

---

35. Doc. 10, ¶ 25.

36. *Id.*, ¶ 26.

37. *Id.* ¶¶ 31, 34.

38. *See, Cable TV Fund 14–A, Ltd. v. Property Owners Association Chesapeake Ranch Estates, Inc.*, 706 F.Supp. 422, 432 (D.Md.1989).

39. *Thos. J. White*, 902 F.2d at 910–911 ("[i]f a cable company enters into a development at the beginning of construction, it is able to

follow directly behind the other utilities and lay its cables before there are lawns, driveways, and other improvements. If improvements exist at the time that a cable operator lays its cables, the cable operator must pay to restore the improvements to their original condition."); *see also, Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir.1994) ("the damages suffered by [cable operator] are incapable of calculation, and not simply difficult to calculate because the service to customers varied.").

of the cable facilities.[40] Moreover, the possibility of damage as a result of the installation of cable lines is minimized because Comcast has hired, and intends to use, the same contractor to install the cable lines, who was used by The Villages to install its own facilities, such as street lights and sewer, and was used by the other utilities to install lines in the joint trenches.[41] As such, it is more than reasonable to conclude that because of the contractor's familiarity with the utility lines in the joint trench the chances for any significant damage is minimal, at best. Lastly, Comcast is an experienced cable company that has been in the cable business for a number of years and has operated in and constructed cable lines on other areas of The Villages. Thus, it is highly unlikely that any substantial harm would be caused to The Villages.[42]

The Villages contends that if an injunction is entered it will suffer more than a mere pecuniary loss because it will be forced to give up the property owner's fundamental right of exclusion which would violate its constitutional rights. For the reasons discussed, *infra,* the Court has concluded that there is no infringement of the private property rights of The Villages. Once The Villages sought and then obtained governmental approval for the improvements to the PUD and then voluntarily granted other utilities, including a competing cable company, the right to permanently construct and install utility lines, it relinquished its right to exclude cable companies from piggy backing on the other utilities. Accordingly, the harm to The Villages, if an injunction is granted, does not outweigh the harm to Comcast if preliminary injunctive relief is not granted.

### D. The Public Interest

The Court concludes that entry of a preliminary injunction will not be adverse to the public interest. Rather, a preliminary injunction will permit the development of a competing cable company in the Marion County portion of The Villages, which ultimately will benefit the residents of The Villages by providing them with packages offered by two competing cable companies. This is consistent with the purposes of the Cable Act which is to "establish franchise procedures ... which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community," and to assure that "[c]able communications provide ... the widest possible diversity of information sources and services to the public ..."[43] Accordingly, entry of a preliminary injunction will advance the public interest and do nothing adverse to the public interest.

### E. Bond

Pursuant to Rule 65(c) no preliminary injunction should issue without the giving of security by the applicant sufficient for payment of costs and damages as may be incurred or suffered by any party to have been wrongfully enjoined.

At the hearing, The Villages argued if a preliminary injunction was entered the amount of any bond set by the Court should be in the amount of the joint trench fee sought to be charged to Comcast. Upon due consideration the Court concludes that this is not an appropriate barometer for the setting of a bond. The

---

**40.** 47 U.S.C. § 541(a)(2)(C).

**41.** Doc. 11, ¶ 17.

**42.** *See, Centel Cable Television Co. of Florida v. Burg & DiVosta Corp.,* 712 F.Supp. 176,

178 (S.D.Fla.1988) (no substantial harm where the cable operator posted a bond, and had been in the cable business for a number of years.)

**43.** 47 U.S.C. § 521(2), (4).

joint trench fee is nothing more than an amount unilaterally set by The Villages and not a sum it is entitled to receive under any contract or agreement. Even assuming the injunction was later determined to have been improvidently granted, The Villages has not been damaged in the amount of the joint trench fee because Comcast is not obligated to pay it and, Comcast to date, has flatly refused to pay the fee because of the high cost. The worst case scenario is that Comcast's cable system is installed before final platting. Moreover, because Comcast will use the same contractor used by the other utilities to install its cable system there will be no increased cost to The Villages.

Comcast has suggested a bond in the amount of $25,000, which should be sufficient to cover any minor property damage and which is an amount consistent with bonds set by other courts in similar situations where cable companies have been denied access.[44] Accordingly, in order for the injunction to be effective Comcast will be required to file an injunction bond in the amount of $25,000 with the Court in a form to be approved by the Clerk of the Court in order to compensate The Villages should it later be determined that the preliminary injunction should not have been entered.

### III. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that Comcast's Motion For Preliminary Injunction (Doc. 5) be **GRANTED** and that the Court enter the preliminary injunction in the form attached hereto.

**44.** *See,* Doc. 9, Tab. A; *Burg & DiVosta,* 712 F.Supp. at 179.