**HUNTINGDON LIFE SCIENCES, INC., Plaintiff,**

v.

**Michelle ROKKE, Ingrid Newkirk, Maybeth Sweetland and People for the Ethical Treatment of Animals, Defendants.**

**No. CIV. 2:97CV597.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 16, 1997.

David Harlen Sump, Donald Charles Schultz, Crenshaw, Ware & Martin, PLC, Norfolk, VA, Stephen D. Poss, Ralph F. Boyd, Jr., Goodwin, Procter & Hoar LLP, Boston, MA, for Plaintiff.

Philip Jay Hirschkop, Marianne Ruth Merritt, Hirschkop & Associates, Alexandria, VA, Glen Alton Huff, Huff, Poole & Mahoney, Virginia Beach, VA, Ray Webb King, Tavss, Fletcher, Early & King, PC, Jeffrey S. Kerr, People for the Ethical Treatment of Animals, Norfolk, VA, for Defendants.

### ORDER and OPINION

MORGAN, District Judge.

This matter is before the Court on defendants' motion to dismiss certain Counts of the Amended Verified Complaint for failure to state claims upon which relief can be granted. For the reasons stated herein, the Court **GRANTS** the motion to dismiss the Lanham Act claim of Count 21 and takes under advisement the motion to dismiss the Racketeer Influenced and Corrupt Organizations Act ("RICO") claims of Counts 23 and 24 and certain state law claims.

### Factual and Procedural History

This lawsuit arises out of an undercover investigation by Michelle Rokke, an employee of People for the Ethical Treatment of Animals ("PETA"), in a New Jersey laboratory owned and operated by Huntingdon Life Sciences, Inc. ("Huntingdon"). PETA is a Delaware 501(c)(3) nonprofit corporation headquartered in Norfolk, Virginia; Huntingdon is a Delaware corporation with a principal place of business in New Jersey. Huntingdon alleges that Rokke sought employment at Huntingdon's animal testing facility in East Millstone, New Jersey by falsely representing (1) that she was pursuing a degree in animal sciences and (2) that she randomly sought employment after driving by the laboratory. Huntingdon hired Rokke as an Associate Technician in the Cardiovascular Unit of the Toxicology Laboratory, and she signed a Confidentiality Agreement before commencing work.

Huntingdon alleges that Rokke was an undercover PETA operative who sought employment at Huntingdon only to investigate its animal testing practices. After working at Huntingdon from September of 1996 until May of 1997, Rokke resigned, and PETA commenced a public relations campaign against Huntingdon. With the information collected from Rokke's investigation, PETA and its agents, Ingrid Newkirk, PETA's President, and Mary Beth Sweetland, PETA's Director of Research and Investigations, issued press releases, participated in interviews and released a videotape taken by Rokke in an effort to attack Huntingdon's animal testing practices. Huntingdon alleges

that Rokke's employment at its facility and the subsequent dissemination of Huntingdon related information by PETA and its agents were unlawful.

Huntingdon filed a Verified Complaint and a motion for a temporary restraining order on June 16, 1997. On June 17, 1997, Judge Smith granted Huntingdon's motion and prohibited the defendants from using the information gathered at the Huntingdon laboratory. On July 7, 1997, Judge Smith found that PETA was in contempt for violating the temporary restraining order. Huntingdon filed its Amended Verified Complaint on July 17, 1997. On July 29, 1997, Judge Doumar granted Huntingdon's motion for a preliminary injunction. PETA filed a motion to dismiss and motion to strike the Amended Verified Complaint on August 7, 1997. The parties appeared before this Court for a hearing on the motion to dismiss on September 3, 1997.

In its Amended Verified Complaint, Huntingdon alleges five federal Counts. By letter dated August 21, 1997, Huntingdon has voluntarily withdrawn two of the federal claims, Counts 13 (alleging violation of the Animal Enterprise Protection Act of 1992) and 14 (alleging violation of 18 U.S.C. § 1832 (1997)). Of the remaining three federal claims, Count 21 alleges a Lanham Act violation and Counts 23 and 24 allege RICO violations.

### Standard of Review

In deciding a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept the facts pleaded by the plaintiff as true. The claim should not be dismissed unless it appears to a certainty that the plaintiff can prove no facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Bruce v. Riddle*, 631 F.2d 272, 273–74 (4th Cir.1980). The court must accept the factual allegations in the complaint and must construe them in the light most favorable to the plaintiff. *Martin Marietta Corp. v. International Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir.1992). The court can only rely upon the allegations in the complaint and those documents attached as exhibits or incorporated by reference. *Simons v. Montgomery County Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 789, 88 L.Ed.2d 767 (1986).

### I. The Lanham Act Violation

#### Summary of Arguments

In Count 21, Huntingdon alleges that PETA published false and disparaging statements in connection with the disclosure of trade secrets and proprietary information. Complaint at ¶ 240. Huntingdon further alleges that the "false statements descriptions and representations published by defendants were made by the defendants in commercial advertising or promotion, and were transported by defendants, or caused to be transported by defendants, in interstate commerce." *Id.* at ¶ 241.

PETA argues that Count 21 of Huntingdon's Amended Verified Complaint fails to state a claim upon which relief can be granted. PETA asserts that its statements were not made "in the context of commercial advertising or commercial promotion" as required by 15 U.S.C. § 1125. PETA further claims that the Lanham Act cannot be used to stifle criticism of a consumer advocate who is not engaged in marketing or promoting a competitive product or service.

Huntingdon responds that a false description or misrepresentation claim requires only material misrepresentations about the nature of another's products or services. For that proposition, Huntingdon cites cases relating to unfair competitive practices between businesses. Huntingdon alleges that the Act is broad enough to encompass claims for promotion of services and that PETA is actively engaged in marketing or promoting a competitive product or service.

#### Analysis

■ The issue of whether a nonprofit organization can be held liable under the Lanham Act for false commercial advertising and promotion appears to be one of first impres-

sion in the Fourth Circuit. The Lanham Act provides, in relevant part:

> (a)(1) Civil action. Any person, who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false misleading representation of fact, which—...
>
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such acts.

15 U.S.C. § 1125(a)(1). Commercial speech is defined as "speech proposing a commercial transaction." *United States v. Edge Broadcasting Co.,* 509 U.S. 418, 426, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 64, 103 S.Ct. 2875, 2878, 77 L.Ed.2d 469 (1983); *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978). The U.S. Supreme Court has recognized "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category," *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 419, 113 S.Ct. 1505, 1511, 123 L.Ed.2d 99 (1993). The Supreme Court has noted that "an expression related solely to the economic interests of the speaker and its audience" is commercial speech. *Id.* at 423, 113 S.Ct. at 1513. However, "[s]peech need not closely resemble a typical advertisement to be commercial." *Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108, 112 (6th Cir.1995).

Applying those principles, the district court in *Oxycal Laboratories, Inc. v. Jeffers,* 909 F.Supp. 719 (S.D.Cal.1995) denied a pharmaceutical company's motion for a preliminary injunction under 15 U.S.C. § 1125(a)(2). There, the author of a book examining cancer and its cures raised the name of plaintiff's trademarked product as a potentially cancer-causing drug. *Id.* at 720. The district court held that "the main pur-

pose of [the author's] book is not to propose a commercial transaction, and [the author's] writing is not solely related to the economic interests of the speaker and its audience." *Id.* at 724. The court noted that the plaintiff had a "very low likelihood of establishing that [the book] [was] commercial speech." *Id.* at 725.

The opinion in *Gordon & Breach Science Publishers S.A. v. American Inst. of Physics,* 859 F.Supp. 1521 (S.D.N.Y.1994) is also instructive to our case. There, the court considered whether the publisher of a non-profit scientific journal could be sued for false advertising under the Lanham Act for publishing comparative surveys of scientific journals which misleadingly rated its own publications as superior. *Id.* at 1523. The court noted the legislative history of the Lanham Act, including Representative Kastenmeier's assurance that:

> [the proposed change to § 43(a)] would exclude all other misrepresentations from section 43(a) coverage. These others are the type which raise free speech concerns, such as a Consumer Report which reviews and may disparage the quality of products, [and] misrepresentations made by interest groups which may arguably disparage a company and its products.... All of these would be judged by first amendment law ... and not section 43(a) law.

*Id.* at 1533 (quoting 135 Cong. Rec. H1216–17 (daily ed. April 13, 1989)). The *Gordon & Breach* court thoroughly examined the limited case law on the issue and set forth a four part test for determining what constitutes "commercial advertising or promotion" under Section 43(a)(1)(B): "there must be: (1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; ... [and] the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion within that industry.' " *Id.* at 1536. Under that test, the court granted the defendant's 12(b)(6) motion, concluding that the articles constituted "protected speech beyond the

reach of the Lanham Act." *Id.* at 1542;[1] *see also Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 141–42 (S.D.N.Y. 1990) (pamphlet which reproduced an artist's work in an effort to stop NEA funding of similar art works was political, not commercial, speech and thus not punishable under the Lanham Act).

As a threshold issue, Huntingdon must establish that PETA's statements constitute commercial speech. On this point, it is important to examine the methods of communication and their purposes noted in the Complaint. In the Complaint, Huntingdon alleges that PETA released a heavily edited videotape of Huntingdon activities to the press on June 4, 1997, along with a press release concerning the videotape. Huntingdon also alleges that defendant Newkirk conducted an interview with radio talk show host G. Gordon Liddy in which she disparaged Huntingdon and made false statements concerning its laboratory practices. Huntingdon further alleges that PETA made false representations in newspaper articles reporting Huntingdon's laboratory practices.

Huntingdon's argument that PETA's speech is commercial hinges primarily on *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114 (D.N.J.1993). There, a nonprofit organization committed to providing pregnancy counseling services sued two previously affiliated groups for misrepresenting, in fundraising letters, how donations would be spent and for deceiving potential donors as to whether the plaintiff and defendant were still in fact affiliated with the organization. *Id.* at 1138. Huntingdon emphasizes the court's finding that "[a]lthough strictly speaking, Birthright, Inc.'s fundraising letters were not commercial advertisements," § 1125(a)(1)(B) covers them as a "promotion of services." *Id.* PETA points out, however, that the misrepresentations in that case were specifically related to raising money for the defendant through a fundraising letter. *See id.* Although there is no such allegation in the Complaint, Huntingdon raises the claim in its

Memorandum that defendant Newkirk mailed a fundraising letter to every PETA member implicating Huntingdon's lab practices and urging readers to "be as generous as you can." Plaintiff's Opposition to Defendants' Motion to Dismiss at 11. Even this allegation is distinguishable from *Birthright;* the defendant in *Birthright* was in direct competition for fundraising dollars with the plaintiff and had in fact splintered off from the plaintiff, while PETA engages in no such direct competition with Huntingdon.

The holdings in *Oxycal Laboratories* and *Gordon & Breach* support PETA's position that its information releases are not punishable under the Lanham Act[2] While increasing its fundraising totals may have been a tangential goal of PETA's actions in Huntingdon's New Jersey laboratory and PETA's subsequent dissemination of information related to that investigation, it cannot be characterized as a primary goal of the investigation of Huntingdon's laboratory.

■ The speech that Huntingdon characterizes as "commercial" is more akin to political speech than commercial speech. None of the allegations in Count 21 specify an economic motive for PETA's actions; instead PETA's intent in publishing the information about Huntingdon's New Jersey laboratory was to disseminate its political message of preventing alleged cruelty to animals.

■ Huntingdon's Lanham Act claim also fails to adequately allege that PETA's actions constitute "advertising or promotion" within the meaning of the Act. In its Memorandum, Huntingdon alleges that PETA is a competitor because it "is actively involved in promoting—to major pharmaceutical corporations and other companies within Huntingdon's customer base—methods of product and drug testing that do not involve animals, in direct competition with certain testing services offered by Huntingdon which do involve animals." Huntingdon cites cases supporting the proposition that letters and telephone calls can constitute "advertising or pro-

---

1. The *Gordon & Breach* court denied a motion to dismiss as to secondary uses of the articles, repeated dissemination of prints of the articles used to convince librarians to buy AIP journals.

2. While this Court does not explicitly adopt the *Gordon & Breach* four part test, the Court notes that Huntingdon's Lanham Act claim would fail under it.

motion." Those cases are distinguishable, however, because they involve communications relating to direct competitors. While Huntingdon alleges that PETA was a competitor, there is no allegation that PETA is engaged in testing any consumer products, the very definition of a direct competitor. Under Huntingdon's rationale every public interest group and consumer reporting service opposing a particular industry or group or commenting upon their product or service would be a competitor for Lanham Act purposes. This Court will not expand the Lanham Act to encompass that rationale.

For the aforementioned reasons, this Court **GRANTS** defendants' motion to dismiss Count 21 of the Complaint.

## II. The Remaining Claims

The Court takes **UNDER ADVISEMENT** the motion to dismiss Huntingdon's RICO claims, Counts 23 and 24 of the Complaint, and its state law claims.

In its ruling from the Bench, the Court **GRANTED** plaintiff **FIVE** (5) days or until September 10, 1997 to amend its Complaint if it so chooses. The Court **GRANTED** defendant **ELEVEN** (11) days from receipt within which to respond to any Amended Complaint.

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED**.