**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1813**

HANDSOME BROOK FARM, LLC,

Plaintiff – Appellee,

v.

HUMANE FARM ANIMAL CARE, INC.,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:16-cv-00592-JCC-MSN)

Argued: May 11, 2017

Decided: August 22, 2017

Before GREGORY, Chief Judge, and DUNCAN and DIAZ, Circuit Judges.

Affirmed by unpublished opinion. Chief Judge Gregory wrote the opinion, in which Judge Duncan and Judge Diaz joined.

**ARGUED:** Lana Marie Manitta, RICH ROSENTHAL BRINCEFIELD MANITTA DZUBIN & KROEGER, LLP, Alexandria, Virginia, for Appellant. Sanjay Satish Karnik, AMIN TALATI UPADHYE, LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** Ryan M. Kaiser, AMIN TALATI UPADHYE, LLP, Chicago, Illinois, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Chief Judge:

Humane Farm Animal Care ("HFAC"), a non-profit organization that certifies certain egg producers for humane treatment of their laying hens, sent an email to thirty-six grocery retailers, including some of the largest grocery chains in the nation. The email reported that Handsome Brook Farm, an egg producer HFAC does not certify, lacked up-to-date certifications to support its representations that its eggs are organic and pasture raised. The email continued, "I hope you reconsider changing suppliers." Egg producers with HFAC's certification, the email concluded, are audited to ensure that every egg labeled pasture raised is, in fact, pasture raised.

Because of this email, Handsome Brook lost existing and potential retailers. And contrary to the email's statements, the record reflects that Handsome Brook's organic certifications were up-to-date and its pasture-raised certification had been recently audited. As a result, Handsome Brook brought a false advertising claim against HFAC under the Lanham Act. The district court issued a preliminary injunction prohibiting HFAC from circulating the email and requiring HFAC to publish a retraction email. HFAC now appeals the entry of the preliminary injunction. For the reasons below, we affirm.

I.

Founded by Adele Douglass, HFAC is a 501(c)(3) non-profit entity dedicated to promoting the humane treatment of animals in the farming and food industry. To further its goal, HFAC has enacted a voluntary certification process that informs consumers

2

about whether a particular producer's products pass HFAC's ethical standards. A producer that chooses to get certified by HFAC and successfully passes HFAC's standards is permitted to use HFAC's registered certification, "Certified Humane," on its products. It must submit to a yearly audit in order to continue using this certification.

HFAC's "Certified Humane" certification process is one of several that producers can choose from, and producers need not choose only one to the exclusion of others. For example, a producer may choose to meet the USDA's standards for an "organic" certification. It may also choose the American Humane Association's "Free Farmed" or "American Humane Certified" certifications or another non-profit entity's certifications.

HFAC receives revenue for "Certified Humane" applications, inspections, and certifications. It charges between $75 and $300 for an application, $600 per day per inspector for any farm inspection, and five cents for every thirty dozen eggs the producer sells with the Certified Humane label. But this revenue does not fully cover HFAC's yearly costs and expenditures, so HFAC also solicits donations.

Douglass was contacted on April 11, 2016, by an individual named Nicholas Hanson. Hanson, an employee of another egg producer, claimed that "he knew people who worked at Phil's Fresh Eggs who packed eggs that were for Handsome Brook Farms. Those eggs, he claimed[,] were not pasture raised but [were] going into cartons that claimed that they were pasture raised." J.A. 127. Douglass told Hanson that HFAC could not do anything because Handsome Brook was not an HFAC licensee. Within a month, Phil's Fresh Eggs requested an audit from HFAC to renew its certification, and HFAC sent an auditor to Phil's Fresh Eggs's packing facility.

On May 13, 2016, when the auditor inspected the facility, Phil's Fresh Eggs's packing plant was packing eggs for both Phil's Fresh Eggs and Handsome Brook. Douglass received an audit report stating that Handsome Brook's egg cartons had both the "American Humane Certified" and USDA "organic" seals. According to the report, the verified USDA organic certificate on file for Handsome Brook "was issued 10-15-2013; no annual update was on file." The "American Humane Certified" certificate was dated November 13, 2015. And "[i]t was noted that there has been no inspection of this facility by [American Humane Association], so the veracity of the label claim on the egg cartons could not be substantiated." J.A. 274.

The audit report also stated that Handsome Brook received its eggs from three producers. When the auditor examined a sample of egg pallets from the three producers, it found that the labels on the sampled pallets did not match the labels on the cartons the eggs were packed in. Specifically, one of the pallets was labeled "Certified Humane," and none of the audited pallets were labeled "American Humane Certified." All of the eggs in those pallets went into "American Humane Certified" cartons. But none of the eggs in the audited pallets, including those labeled "Certified Humane," entered "Certified Humane" cartons.

On May 20, 2016, Douglass sent the following email to thirty-six retailers, including Costco, Fairway, The Fresh Market, Harris Teeter, Kroger, Lowes Foods, Publix, Safeway, Target, Wegman's, and Whole Foods:

> I am writing you to share some potentially troubling news about one of your egg suppliers, Handsome Brook Farm. Based upon a whistleblower complaint we recently conducted a traceability inspection of a packing

4

plant that packs Certified Humane® eggs and also packs Handsome Brook Farm's (HBF) eggs. It came to our attention that the "Pasture Raised" claims on the Handsome Brook Cartons could not be verified. In fact, of the three producers whose eggs were being packed into HBF cartons, none were pasture raised. These eggs had tags that stated, "Certified Organic" but our auditors found that the organic certification was not current.

American Humane Certified (AHC) is Handsome Brook Farm['s] humane certifier. Our auditor found that there was no validation that the eggs going into the HBF cartons were from AHC certified farms, noting that, "None of the eggs were identified as AHC, though they go into AHC labeled cartons." Our auditor also stated, "Handsome Brook Farm eggs include the American Humane Certified logo and the USDA organic seal. The eggs are certified organic by NOFA-NY. NOFA-NY certificate verified on file was issued 10-15-2013; no annual update was on file. The AHC certificate on file was dated November 13, 2015 and was issued to Handsome Brook Farm. It was noted that there has been no inspection of this facility by AHC so the veracity of the label claim on the egg cartons could not be substantiated.

I hope you will reconsider changing suppliers. Producers who are Certified Humane® undergo traceability audits to verify that every egg that goes into every carton that has claims such as "free range" or "pasture raised" are verified by our inspectors to be exactly that. This in turn protects you.

J.A. 50.

Douglass stated that she sent the email to retailers with whom she had a relationship and who were considering switching to Handsome Brook eggs.[1] Douglass never called Handsome Brook's certifier or took any steps to verify what the audit report had recounted. Based on this email, some stores pulled Handsome Brook's eggs, either temporarily or indefinitely, from their shelves. And a prospective retailer indefinitely delayed plans to launch Handsome Brook's eggs in their stores.

---

[1] Given that some of the recipients had been carrying Handsome Brook's eggs, it is fair to assume that Douglass meant that she sent the email to retailers who were considering or who were already carrying Handsome Brook's eggs.

5

Handsome Brook sued HFAC on May 27, 2016, alleging a false advertising claim under the Lanham Act. As part of the record, Handsome Brook included up-to-date organic certifications for each of their three suppliers, and affidavits from the American Humane Association asserting that both Handsome Brook and its suppliers had been audited.

The district court first granted Handsome Brook's requested temporary restraining order. It later found that a preliminary injunction was warranted. Specifically, it found that Handsome Brook's false advertising claim was likely to succeed: HFAC's email was commercial speech because of the inherently commercial structure of HFAC's operations and the commercial purpose of its email; applying the *Gordon & Breach* factors discussed below, the email was a form of commercial advertising or promotion; the email was likely false or misleading in stating that (1) Handsome Brook's eggs were not pasture-raised, (2) HFAC audited Handsome Brook based on a whistleblower complaint, and (3) Handsome Brook's organic certifications were not current; and these statements likely were material, deceived the consumer, and caused irreparable injury. As a result, the district court entered a preliminary injunction prohibiting HFAC from disseminating the email and requiring HFAC to publish a retraction email.

HFAC timely appeals.

## II.

We review a district court's grant of a preliminary injunction for abuse of discretion. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). As a result, we review

6

the district court's factual findings for clear error and its legal conclusions de novo. *Id.* A preliminary injunction is warranted if (1) the plaintiff will likely succeed on the merits, (2) the plaintiff will likely suffer irreparable harm if the preliminary injunction is denied, (3) the balance of equities favors granting a preliminary injunction, and (4) the public interest counsels in favor of granting the preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On appeal, HFAC challenges the district court's determinations that the email was a commercial advertisement or promotion, that the term "whistleblower" was misleading, that Handsome Brook was irreparably harmed by the email, that the balance of equities favors granting the injunction, and that the injunction was in the public interest.

III.

When reviewing a preliminary injunction, the first question is whether Handsome Brook has shown a likelihood of success on the merits of its false advertising claim. The Lanham Act prohibits false or misleading facts, or representations of fact, "in commercial advertising or promotion" that misrepresent the quality of another person's goods. 15 U.S.C. § 1125(a)(1)(B). To prevail on its false advertising claim, Handsome Brook must show that HFAC's email contained false or misleading statements "in a commercial advertisement about his own or another's product"; the misrepresentation was material, likely to influence the purchasing decision, and has the tendency to deceive a substantial segment of its audience; HFAC placed the misrepresentation in interstate commerce; and Handsome Brook was injured or likely to be injured by the misrepresentation, either by

7

direct diversion of sales or the lessening of goodwill. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011) (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (2002)).

The most contested question is whether HFAC's email, which attempted to warn retailers of the problems with Handsome Brook's certifications and which named HFAC's certification as superior in reliability and trustworthiness, is commercial advertising or promotion.

A.

The Lanham Act does not define "commercial advertising or promotion." And neither the Supreme Court nor this Court has determined how to assess whether a communicative message is commercial advertising or promotion. A court in the Southern District of New York has defined commercial advertising or promotion for the purposes of the Lanham Act as (1) commercial speech (2) by a defendant in commercial competition with the plaintiff (3) for the purpose of influencing consumers to buy goods or services. *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994). And while the representation need not be a classic advertising campaign, but may include more informal types of promotion, the representations (4) must be sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within that industry. *Id.*

Many of our sister circuits have adopted these factors in full. *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338 (11th Cir. 2012); *Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc.*, 332 F.3d 6 (1st Cir. 2003); *Proctor & Gamble Co. v.*

8

*Haugen*, 222 F.3d 1262 (10th Cir. 2000); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379 (5th Cir. 1996). *But see First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803-04 (7th Cir. 2001) (rejecting *Gordon & Breach* factors, and determining that "advertising or promotion" is a subset of commercial speech aimed at anonymous recipients). We similarly adopt these factors.

But following the Sixth Circuit, we do not adopt the second factor requiring a competitive relationship. *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 800-01 (6th Cir. 2015) (adopting all *Gordon & Breach* factors except the competition requirement); *cf. Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 58 (2d Cir. 2002) (adopting *Gordon & Breach* factors, but not deciding whether to adopt the competition factor). While many of our sister circuits have recognized that an economically competitive relationship is necessary for a false advertising claim, the Supreme Court has recently made clear that the analysis is best suited not in the merits of whether a communication is advertising, but in standing.[2] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014); *see also Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787 (5th Cir. 2011) (examining whether corporations have sufficiently competitive relationship in standing analysis); *Serbin v. Ziebart Int'l Corp.,*

---

[2] The parties dispute whether *Lexmark*'s principles apply to the competition requirement in *Gordon & Breach*. But they do not dispute that Handsome Brook had standing to bring a false advertising claim, and--therefore--that Handsome Brook's competitive relationship with HFAC satisfies *Lexmark*'s requirements.

*Inc.*, 11 F.3d 1163 (3d Cir. 1993) (recognizing that consumer, lacking a competitive economic relationship, has no standing to raise a Lanham Act claim). And upon consideration, any communication that is commercial speech, promotes a good, and is sufficiently disseminated is an advertisement for the promoted good, regardless of the speaker. A competitive relationship, therefore, is necessary inasmuch as it gate-keeps *who* may appropriately bring suit. This is especially true for realizing Congress's intent that the Lanham Act "protect persons engaged in [interstate] commerce against unfair competition." 15 U.S.C. § 1127; *see also Lexmark*, 134 S. Ct. at 1389-90 (reasoning that only commercial competitors, not consumers, suffer from unfair competition and thus have standing to enforce the Lanham Act's prohibitions). Taking into account *Lexmark*, the lack of a competition requirement in the statute's false advertising prohibition, the fact that our sister circuits adopting the competition factor did so before *Lexmark*, and that the only circuit to examine the *Gordon & Breach* factors post-*Lexmark* has rejected the competition factor, we also do not require a competitive relationship when determining whether a communication is advertising or promotion. As a result, we adopt only the first, third, and fourth factors of the *Gordon & Breach* test.

B.

We next apply these factors to HFAC's email. We begin with the requirement that the challenged advertising or promotion constitute commercial speech. This inquiry, however, poses an antecedent question: How do we determine whether a communication is commercial speech? And how do we classify communication that expresses both commercial and noncommercial messages?

10

1.

Save for certain, carefully circumscribed forms of expression, speech is protected by the First Amendment.  But commercial speech receives less protection than pure noncommercial speech. *Bigelow v. Virginia*, 421 U.S. 809, 825-26 (1975).  At its core, commercial speech is "speech which does 'no more than propose a commercial transaction.'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (quoting *Pittsburgh Press Co. v. Hum. Relations Comm'n*, 413 U.S. 376, 385 (1973)).  It is thus removed from the "exposition of ideas" or the expression of "truth, science, morality, [the] arts in general" and other topics that characterize speech fully protected by the First Amendment. *Id.* (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) and *Roth v. United States*, 354 U.S. 476, 484 (1957)).  And because of the government's interest in "insuring that the stream of commercial information flow cleanly as well as freely," *id.* at 772, restrictions on "false, deceptive, and misleading commercial speech," like the Lanham Act's prohibition against false or misleading commercial advertising or promotions, are wholly permissible means of furthering that interest, *Friedman v. Rogers*, 440 U.S. 1, 9-10 (1979).

Neither our precedent, nor the Supreme Court, has issued any determinative standard by which to assess if a message is commercial speech.  The Supreme Court has highlighted a handful of considerations, and our own cases have been similarly context-specific.  These factors are all illustrative, but none are determinative.  A message may bear many of these qualities yet not be commercial speech; and a message may lack some of these qualities yet still be commercial speech.

11

The Supreme Court has identified three qualities of commercial speech: whether the message is economically motivated, promotes a specific product, and is an advertisement. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983). Thus, as found in *Bolger*, a corporation that sells contraceptives and publishes pamphlets advocating for the superiority of its products engages in commercial speech.

Our own precedent has alluded to yet another quality of commercial speech: whether the message is "placed in a commercial context and [is] directed at the providing of services rather than toward an exchange of ideas." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 286 (4th Cir. 2013) (quoting *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176 (N.D. 1986), *cert. denied*, 476 U.S. 1108 (1986)). In *Greater Baltimore Center for Pregnancy Concerns v. Mayor & City Council of Baltimore*, this Court remanded the question of whether a crisis pregnancy center's promotion of its services was commercial speech. But in doing so, this Court approvingly highlighted a state supreme court case that considered as commercial speech a non-profit crisis pregnancy center's misleading promotion of services in newspapers and yellow-page advertisements.

2.

With these factors in mind, we next determine whether HFAC's email is commercial speech.[3]

---

[3] *Bolger* recognized three qualities of commercial speech, the third of which was whether the communication is an advertisement. Because the speaker in *Bolger* (Continued)

12

We first consider whether HFAC was economically motivated. This prong asks whether HFAC hoped to realize an economic gain when disseminating its message.

HFAC is a non-profit organization, and as such has a noneconomic purpose in advocating for the humane treatment of farm animals. But HFAC also has an economic motivation in the sale of its licensees' eggs. Not only does HFAC receive revenue from egg sales, but it may also gain more licensees if its "Certified Humane" certification is seen as more reliable than other non-profit organizations' certifications. This hope of economic gain is made even more apparent by the email's target audience: grocery store chains, including some of the largest in the nation, that HFAC had a relationship with and that were considering switching their egg supplier from another brand to Handsome Brook. HFAC's list of recipients evidences its hope of economic gain--that is, that the grocery stores would switch their businesses from Handsome Brook to HFAC licensees.

The parties dispute whether HFAC's identity as a non-profit, rather than for-profit, organization categorically deems its motivation noneconomic. And certainly, the identity of the speaker factors into the reasonable recipient's perception of economic motivation. A for-profit company is often presumed to have primarily economic motivations for its speech. Thus, a corporation's informative literature or seminar is often still seen as commercial speech, especially if it includes any product promotion. For example, the

identified his material as advertisements, the Court had no occasion to decide if the pamphlets were advertisements. The factor is unhelpful here, where we must determine if HFAC's email is commercial speech in order to see if it is commercial advertising or promotion. We therefore do not address this non-dispositive quality.

13

Supreme Court examined in *Bolger* the pamphlets a corporation published, informing readers about contraception and promoting the corporation's contraceptive products. In finding the pamphlets to be commercial speech, the Court stated,

> [a] company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions. *Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.*

*Bolger*, 463 U.S. at 68 (emphasis added). There, the Supreme Court presumed that the for-profit corporation included noncommercial messages to insulate its advertisement from government review, rather than for the noneconomic purpose of educating the public about contraceptives.

Conversely, a non-profit organization is often presumed to have primarily noneconomic motivations for its speech, even if there are ancillary economic benefits. Thus, a watchdog non-profit organization's report on allegedly abusive or unethical practices is still likely noncommercial speech, even if the report garners more donations; a reader would know that the watchdog organization's primary motivation for publishing the report is noneconomic. *See Huntingdon Life Sciences, Inc. v. Rokke*, 978 F. Supp. 662 (E.D. Va. 1997) (adjudicating dispute between PETA and a corporation whose lab practices were criticized by PETA). And disinterested non-profit journals or publications that review products engage in noncommercial speech, even if they publish negative reviews. *See Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Medicine*, 189 F. Supp. 2d 271 (D. Md. 2001) (finding that trade journal's publication of a negative or lukewarm

14

review of a product is noncommercial speech); *Gordon & Breach*, 859 F. Supp. 1521 (finding that scientific journal's publication of scientific-journal rankings by cost of journal per thousand characters and times cited is noncommercial speech). *See also* 135 Cong. Rec. H1217 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier) (recognizing that limiting the Lanham Act's reach to only commercial speech ensures that the Act does not cover "political speech, consumer or editorial comment, parodies, satires," consumer reports, and other constitutionally protected material).

But identity of the speaker does not categorically determine whether a speaker is economically motivated. Where a non-profit organization has a direct economic stake in the provision of its product or service, and structures its message in the hopes of realizing an economic gain rather than merely informing the public or pursuing its ideological views, it may reasonably be viewed as economically motivated.

Here, HFAC could have disseminated the message to the public at large or to the egg industry in order to shame Handsome Brook. It also could have disseminated the message to only Handsome Brook's certifier or to grocery stores that sold Handsome Brook eggs. HFAC's specific target audience--retailers who were considering or had recently switched to Handsome Brook eggs--and last paragraph extolling the reliability of its own certifications, bespeaks of HFAC's economic motivation despite its entity as a non-profit organization.

The second prong asks whether HFAC's email promoted a good. After telling its recipients about Handsome Brook's certifications, HFAC's email stated, "I hope you will reconsider changing suppliers." HFAC-licensed producers, the email continued,

15

"undergo traceability audits to verify that every egg that goes into every carton that has claims such as 'free range' or 'pasture raised' are verified by our inspectors to be exactly that. This in turn protects you."

HFAC argues that its email did not specifically promote eggs certified with HFAC's "Humane Certified" license over Handsome Brook's; it merely urged retailers to purchase any eggs that were humane, whether certified by HFAC or another certifying institution, rather than Handsome Brook's allegedly inhumane eggs. But in comparing its certification to any other carton that says "free range" or "pasture raised," the email was not just comparing its certifications to Handsome Brook or to non-certified eggs. The email implicitly compared its licensees to the licensees of any other humane certification, and touted HFAC-certified eggs over all other eggs, including eggs certified by other organizations. Thus, the email's final statements were intended to, and indeed did, promote HFAC-certified eggs over any other eggs, including those certified by other organizations.

Third, we consider whether HFAC's message was placed in a commercial context and fixated on the provision of services rather than advocacy of its ideological commitments. Here, HFAC's email both was placed in a commercial context and fixated on the provision of services.

HFAC's occupies a commercial role in the economic market of humanely produced eggs, and its email was placed in that economic, commercial context. HFAC, and organizations like HFAC, function as a cog in the production and sale of pasture raised eggs; without such certifications, consumers are less likely to trust a producer's

16

practices and pay higher prices. And HFAC's message fits neatly into the type of promotional, commercial activity an identical for-profit organization would engage in. This situation is thus different from a non-profit organization that promotes an auction in its name to drum up contributions or sells its paraphernalia, like hats or t-shirts or pens, to supplement its charitable donations. In those situations, the organization is surely promoting a service; yet a reasonable recipient would recognize that the context was meant to celebrate, promote, and spread its ideological mission.

HFAC's email also fixated on the provision of service, rather than the advocacy of its ideology. The email was directed at only individuals with whom HFAC had economic relationships, and whose business HFAC may lose or hopes to gain. Its message focused, not on ideological or moral concerns, but on economic and legal ones--"this in turn protects you." It engaged with the grocery stores, not as an entity motivated by an ideological mission, but as a commercial actor in the industry of higher-priced, humane-certified eggs. More like a crisis pregnancy center than PETA, HFAC's email was "directed at the providing of services rather than toward an exchange of ideas."[4] *Greater Balt. Ctr.*, 721 F.3d at 286 (quoting *Fargo Women's Health Org.*, 381 N.W.2d at 181).

---

[4] HFAC argues that it is a non-profit organization that fulfills its mission by conducting itself as an economic actor in the commercial industry of egg sales. Thus, its behavior in commercial markets as an economic actor is all meant to promote its ideological mission. Accepting HFAC's argument, however, inappropriately melds the first prong of the analysis, which examines the speaker's motivation, with the third prong of the analysis, which examines a recipient's expectation. HFAC's hope to promote its ideological message through commercial communication does not change the fact that a
(Continued)

17

HFAC's email, sent by an organization with an economic stake in the grocery stores' decision, notified only certain retailers about the allegedly bad practices of its indirect competitor, and touted itself as a superior, more reliable, and therefore better economic partner.  Its email appealed to the stores' economic and commercial motivations, and was directed at offering a service--the reliability of its certification—rather than an idea. Its conduct was, in many ways, indistinguishable from that of a for-profit organization.  And in this specific context, its identity as a non-profit organization did not override the many commercial qualities of its message.

3.

HFAC's email also in part disseminates noncommercial speech:  its warning to retailers about Handsome Brook's allegedly fraudulent labeling.  When a message communicates both commercial and noncommercial speech, it is treated like commercial speech unless the commercial and noncommercial messages are "inextricably intertwined."  *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).  Here, for the reasons discussed below, this message is not "inextricably intertwined" with HFAC's promotion of its license.  Thus, though the email bears mixed messages, the district court correctly treated the email as commercial speech.

Under this "inextricably intertwined" analysis, solicitation for charitable donations by non-profit organizations is noncommercial speech, wholly protected by the First

recipient will likely view its communication as a promotion of services in a commercial context.

18

Amendment, even though it solicits money. *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980). Disclosures about a non-profit organization's professional fundraiser's financial motivations are considered fully protected, noncommercial speech. *Riley*, 487 U.S. 781. And even a non-profit organization selling toys or jewelry to support its expenses, like an animal-rights organization selling stuffed animals emblazoned with its logo, may still be noncommercial speech. *Gaudiya Vaishnava Soc'y v. City & County of San Francisco*, 952 F.2d 1059, 1063-65 (9th Cir. 1990). This is because a non-profit organization's solicitation for donations often is "intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," and secondly, because without such solicitation, "the flow of such information and advocacy would likely cease." *Schaumburg*, 444 U.S. at 632. Thirdly, a charitable solicitation "does more than inform primary economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services." *Id.* In short, a non-profit organization cannot solicit donations without also advocating for its mission; and conversely, a non-profit organization cannot advocate for its mission unless it can solicit donations to support its advocacy.

In contrast, an educational seminar hosted by a corporation that sells houseware, where attendees both may purchase the products and learn "how to be financially responsible and how to run an efficient home," is still treated as commercial speech. *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989). "[T]here is nothing whatever 'inextricable' about the noncommercial aspects of these presentations.

19

No law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares." *Id.* at 474.

HFAC's promotion of Certified Humane eggs is not "inextricably intertwined" with its warning to retailers that Handsome Brook's eggs may bear misleading labels. Just as a corporation is capable of conducting an educational seminar without promoting its own product, "[n]o law of man or of nature makes it impossible" to warn the public of misleading labeling without promoting one's own products. And thus, even assuming that HFAC's email without the promotional last paragraph were noncommercial speech, HFAC was capable of notifying grocery stores about the issues in Handsome Brook's certifications without promoting its own certification. The commercial proposition in HFAC's email is therefore not "inextricably intertwined" with its noncommercial message. As a result, the email is commercial speech despite its mixed messages.

## C.

We turn to the next *Gordon & Breach* factor: promotion of a good. This inquiry is identical to the promotion inquiry conducted in Section III.B.2. For the same reasons as stated above, HFAC's email promoted Certified Humane® eggs over eggs licensed by any other organization.

## D.

We turn to the last *Gordon & Breach* factor: dissemination of the message. A communication may be advertising or promotion only if it is "part of an organized campaign to penetrate the relevant market." *Grubbs*, 807 F.3d at 800-01 (quoting *Fashion Boutique of Short Hills, Inc.*, 314 F.3d at 57). Widespread market distribution

often demonstrates an organized campaign, but is not necessary. For example, a promotion aimed at a subset of customers, such as a "friends and family" sale or an advertisement shown to consumers based on their Internet history, is sufficiently distributed to show an attempt to penetrate the relevant market even if it has been sent to only a portion of the consumer base. *See id.* at 801.

HFAC's email went to thirty-six retailers, including some of the largest supermarket companies in the nation. The email did not go to every grocery store in the nation; as the district court noted, there "are *many* national and *countless* regional and local retailers that are not included." J.A. 500 (quoting Def.'s Mem. in Opp'n at 14). But a "cold-send" to anonymous recipients is not needed for a dissemination to be considered advertising. This email, sent to thirty-six major retailers of ethically sourced eggs, all of whom were chosen because they were considering switching to Handsome Brook eggs, was sufficiently disseminated to be an attempt to penetrate the relevant market.

HFAC's email satisfies the three *Gordon & Breach* factors which we adopt, and is therefore commercial advertising or promotion.


IV.

Turning to another element of the Lanham Act claim, HFAC next argues that the district court erroneously concluded that Handsome Brook was likely to succeed on the merits because, contrary to the district court's finding, HFAC's "whistleblower" statement was not false or misleading. The statement is as follows: "Based upon a

21

whistleblower complaint we recently conducted a traceability inspection of a packing plant that packs Certified Humane® eggs and also packs Handsome Brook['s ] eggs."

HFAC argues that, while legal professionals know "whistleblower" means an individual reporting his own employer's bad actions, the email recipients, who were not legally trained, would interpret "whistleblower" as meaning someone in the industry. Because HFAC had received a complaint about Handsome Brook's eggs from Hanson, another egg producer's employee, HFAC argues that its statement was neither false nor misleading.

Regardless of whether labeling Hanson a whistleblower is misleading or false, HFAC's statement is still likely false, because HFAC never conducted the audit "based on" the complaint it received. In fact, HFAC had told Hanson that it could not do anything about the allegedly unethical egg-packing because it was not Handsome Brook's licenser. Its audit was not based on the complaint, but was based on its routine audit of Phil's Fresh Eggs. Thus, the district court did not abuse its discretion in determining that Handsome Brook was likely to succeed on the merits of its false advertising claim.

V.

In addition to finding a likelihood of success on the merits, the district court determined that Handsome Brook had suffered irreparable harm and will continue to suffer irreparable harm if the injunction is denied; that the balance of equities favored

22

granting the injunction; and that public interest counsels in favor of granting the injunction. We address these factors in turn.

A.

Handsome Brook must show that the likelihood of irreparable harm rises above the threshold of mere possibility and is likely to occur if the request is denied. *Winter*, 555 U.S at 22. "[T]he possibility of permanent loss of customers to a competitor or the loss of goodwill" may give rise to irreparable harm. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7; *see also Scotts Co.*, 315 F.3d at 283. And while monetary damages generally do not give rise to irreparable harm, irreparable harm may still occur in extraordinary circumstances, such as when monetary damages are unavailable or unquantifiable. *See Multi-Channel TV Cable Co.*, 22 F.3d at 551; *Hughes Network Sys., Inc. v. InterDigital Comms. Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

Handsome Brook alleges (and the district court found) that because of the false information in the email, two retailers have removed Handsome Brook eggs from their shelves and a third retailer has indefinitely suspended plans to sell Handsome Brook eggs. Handsome Brook also alleges (and the district court found) that the email has unduly strained client relationships; for example, one of its brokers heard the email being discussed at an industry trade show, indicating that retailers continue to circulate the email's contents.

Based on these facts, the district court appropriately exercised its discretion in finding that Handsome Brook would suffer irreparable harm if the preliminary injunction

23

were not granted. Handsome Brook had already lost customers, and further dissemination of the email amongst retailers may result in further loss of customers. The business's reputation continues to be tarnished as questions about the reliability of its labeling continue to circulate. And even if the monetary damages from Handsome Brook's lost profits were quantifiable, they would likely be unattainable at judgment; Handsome Brook estimated that its monthly loss of revenue could number in the hundreds of thousands, and HFAC is a non-profit organization that likely cannot pay the damages Handsome Brook would be due.

This irreparable harm supports the district court's injunction prohibiting HFAC from circulating the email and requiring HFAC to publish a retraction email. Handsome Brook alleges that, even without HFAC's assistance, the email has continued to circulate as recipients forward the email to other members of the industry. Thus, Handsome Brook will continue to suffer irreparable harm unless HFAC publishes a retraction email that can disseminate its corrective message through the same channels as the first, misleading email.

B.

HFAC alleges that the equities counsel against the district court's injunction because the injunction imposes an unconstitutional prior restraint on its speech and requires an unconstitutional compelled disclosure. For the reasons below, neither of these arguments is persuasive, and the equities balance in favor of the injunction.

"Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976)

(quoting *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). But even if the injunction were a prior restraint, prior restraints prohibiting false and misleading commercial speech are constitutional. *See, e.g.*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980) ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."). Because, as determined above, HFAC's email is likely false or misleading commercial speech, the district court may prohibit HFAC from disseminating the email.

The First Amendment also allows the district court to require HFAC to issue a retraction email. While compelled speech is usually a bold remedy in the context of noncommercial speech, compelled speech is more likely to be constitutionally permissible in the context of commercial speech. Indeed, our First Amendment jurisprudence on commercial speech "is justified principally by the value to consumers of the information such speech provides." *Zauderer v. Office of Disciplinary Counsel of the Supreme Court*, 471 U.S. 626, 651 (1985). Thus, "disclosure requirements aimed at misleading commercial speech need only survive rational basis scrutiny, by being 'reasonably related to the State's interest in preventing deception of consumers.'" *Greater Baltimore Ctr.*, 721 F.3d at 283 (quoting *Zauderer*, 471 U.S. at 651); *see also In re R.M.J.*, 455 U.S. 191, 201 (1982) ("a warning or disclaimer might be appropriately required, even in the context of advertising as to price, in order to dissipate the possibility of consumer confusion or deception.").

25

Here, compelling HFAC to issue a retraction email is reasonably related to the State's interest in preventing deception of consumers. HFAC's email informed the grocery stores, who were Handsome Brook's consumers, that Handsome Brook's eggs were not pasture raised or organic. As determined by the district court and largely uncontested here, this email was likely false or misleading. Merely refusing to further disseminate the email reduces the speed by which the false information spreads, but provides no remedy for those who have already read the email and those who share the email with others. Requiring HFAC to issue a retraction email, sent to its initial list of recipients, is a reasonably related requirement to ensure that those who received the first email will also receive the retraction email that mitigates the harm the first email caused.

Requiring HFAC to issue a retraction email thus comports with the First Amendment. Taking into account the irreparable harm that may occur without the injunction and the constitutionality of the injunction's restraints, the balance of equities counsels in favor of the preliminary injunction.

C.

Lastly, the district court correctly determined that preliminary injunctive relief was in the public interest. "There is a strong public interest in the prevention of misleading advertisements." *Scotts Co.*, 315 F.3d at 286 (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 597 (3d Cir. 2002)); *see also Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 491 (8th Cir. 1993) ("the public interest favors enjoining false statements"). And it

26

is in the public's interest to ensure that such false information is corrected. Thus, public interest counsels in favor of granting the preliminary injunction.

## VI.

For these reasons, the district court's grant of a preliminary injunction is

*AFFIRMED*.